**STATE of Tennessee**

v.

**Cordell Remont VAUGHN.**

Court of Criminal Appeals of Tennessee, at Nashville.

January 23, 2008 Session.

June 16, 2008.

Joshua L. Rogers, Franklin, Tennessee, for the appellant, Cordell Remont Vaughn.

Robert E. Cooper, Jr., Attorney General and Reporter; Preston Shipp, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Jeffrey L. Long, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

A jury convicted the Defendant, Cordell Remont Vaughn, of premeditated first degree murder, and he was sentenced to a life term in the Department of Correction. In this direct appeal, he presents four

issues for our review: (1)whether the evidence is sufficient to support his conviction; (2) whether the trial court abused its discretion by denying the Defendant's request for a continuance after his family hired a private attorney to represent him approximately one week before the scheduled trial date; (3) whether the trial court abused its discretion by revoking its approval of funds for the Defendant to hire an expert because the Defendant retained private counsel; and (4) whether the trial court erred by not requiring the assistant public defender to assist defense counsel during the Defendant's trial. Following our review of the record and the parties' briefs, we reverse the judgment of conviction and remand for a new trial.

## Factual Background

On February 17, 2005, at approximately 6:00 p.m., the victim, Catricia Candance McPheters, was shot seven times and killed at the Defendant's home in Linden. A grand jury subsequently indicted the thirty-five-year-old Defendant for first degree premeditated murder, and a jury trial followed.

At trial, the Defendant's wife,[1] Chandra Ewing Vaughn, testified that she was living with the Defendant at the time the homicide occurred. That morning, the victim and the Defendant had an argument. Asked how "heated" the argument was, Mrs. Vaughn said, "it wasn't that bad." Afterwards, the victim and Mrs. Vaughn went to a grocery store together and then returned to the house. Later that day, Mrs. Vaughn and the Defendant went "somewhere" and returned in the afternoon.

An unspecified period of time later, as Mrs. Vaughn was folding clothes in a front bedroom, she heard the Defendant and the victim arguing again in the kitchen. Mrs. Vaughn heard gunshots, and she saw the Defendant firing a handgun at the victim. She ran through the kitchen to pick up a young girl[2] who was staying at their house, and as she ran, the Defendant continued to fire the gun at the victim.

Mrs. Vaughn testified that the victim had a knife in her hand at the time of the shooting and had been using the knife to peel potatoes. However, in a statement she gave the day after the incident (eighteen months before trial), she related that while the shooting was taking place, she "didn't see anything in [the victim's] hands. [The victim] had been peeling potatoes."

Mrs. Vaughn did not see the Defendant with a gun at anytime prior to the shooting that day. He had not been carrying the gun with him when they went out together after her shopping trip with the victim. She did not know from where he obtained the gun.

After she got the young girl, Mrs. Vaughn ran out the back door to her next door neighbor's, Anthony Head's, house. Mrs. Vaughn calmed the girl for a "few minutes," then left her at the Heads' residence. She left to find her cellular telephone, which took "maybe a minute or two," and then called her sister in order to tell her to come pick up the girl. She then returned to the Heads' house and described the Defendant's subsequent arrival there as follows: "[The Defendant] came into the—he came in, like crawling, like on

---

1. At the time of the incident, Mrs. Vaughn was engaged to the Defendant; they married afterwards.

2. Mrs. Vaughn explained that the little girl was approximately four years old, and she was her "sister's ex-boyfriend's little girl."

The relationships between all the individuals involved in this case are confusing because they were never fully or adequately explained. Consequently, we are not able to fully understand these relationships from the testimony presented.

the floor, and he grabbed my leg. I couldn't understand the words that he was saying, but he said something about call— call the police, get help or something, I don't know exactly what the words were." At that time, the Defendant had blood on his shirt from wounds to his chest.

On redirect examination, Mrs. Vaughn confirmed that in the statement she gave the day after the shooting, she indicated that the Defendant and the victim had been arguing about the victim's relationship with a man named DeAngelo. DeAngelo was the ex-boyfriend of Mrs. Vaughn's sister. The Defendant was angry because the victim apparently had sexual relations with DeAngelo inside the Defendant's house, which he considered disrespectful.

The Defendant's brother-in-law, Ronnie Tucker, testified that the victim was his daughter-in-law and that he was present at the Defendant's house during the shooting. Tucker had traveled to the Defendant's house from Nashville in order to remodel his bathroom, and he had been there approximately three days before the incident occurred. The victim had traveled to the Defendant's house from Nashville with Tucker.[3]

On the day of the incident, the victim was cooking dinner, and as Tucker went about his work on the bathroom, he heard the Defendant and the victim arguing in the kitchen. He did not know the subject of their argument. Approximately ten minutes later, as he was at work in the crawlspace underneath the house, he heard several gunshots. He emerged from the crawlspace and saw the victim lying on the sidewalk outside the kitchen door of the Defendant's house. At that time, Tucker turned the victim over to "see what [he] could see." She did not

react when he touched her, and he assumed she was dead. Asked whether he noticed "anything" lying on top of the victim's body, Tucker said that he "[r]eally didn't pay attention to none of that" because he was "ready to go."

After looking at the victim, Tucker ran inside the house, and he encountered the Defendant in the kitchen; the Defendant asked him, "What have I done, Bro'?" Tucker responded, "You done screwed up," and then he ran out of the house and went to a nearby store to call his wife. He did not see any kind of powder on the floor or counters before leaving.

Johnny Hester testified that he lived in a one-room shed located behind the Defendant's house and did carpentry work for him. On the day of the incident, Hester was helping Tucker remodel the bathroom. He had lunch that day with the victim and Tucker. By Hester's account, the victim announced during lunch that she was angry with the Defendant; she was holding a "paring knife and she said she's gonna stab him." Asked whether he knew why the victim was angry with the Defendant, Hester said that he did not know "what the problem was. Earlier that day, you know, I know that they was—her and him had been smoking, you know, some— some—that stuff, or whatever."

Around dusk that same day, Hester was resting in his shed when he heard "a little bit of arguing going on" between a man and a woman. Several minutes later, he heard gunshots. He waited "a little bit" then looked outside and saw Tucker, Mrs. Vaughn, and the young girl leave. Approximately ten minutes later, Hester left his shed, went inside the house and saw green powder on the floors. Then, he

---

**3.** Other testimony indicated that the victim had traveled to the Defendant's house from

California.

described finding the Defendant and the victim as follows:

I seen the [victim] laying there, and she was right outside on—you know, the bottom of the steps. [The Defendant] was right beside her and he was—kept trying to get her to wake up. And then he asked me, he said, "Well, [Hester], do CPR on her." And I said, "Man, I don't know CPR." And so then I reached down and I felt of her, you know, tried to feel for a pulse or anything, and then I told her [sic], I said, "She's gone, man." And then right after that I just walked on into the—back to my [shed] and shut the door.

Shortly after Hester returned to the outbuilding, the Defendant knocked on the shed's door, with a pistol in his hand. Hester opened the door, and the Defendant tried to hand him the pistol, urging him to "[g]et rid of it." At first, Hester refused to touch the pistol for fear of putting his fingerprints on it. But, the Defendant persisted, and Hester complied by grasping it in his shirt. However, when the Defendant turned around to walk away, Hester "slung it off in the weeds." Hester went back inside his shed and stayed there until he was arrested by police. Ultimately, he was charged with violating his parole.

Hester was not asked whether the Defendant's chest was wounded and bloody or whether the victim had a knife on or near her body.

The Defendant's neighbor, Anthony Head, testified that on the evening of the incident, Mrs. Vaughn arrived at his house with a young girl and was visibly upset as she told him that there had been a shooting. Mrs. Vaughn left the girl at Mr. Head's house before leaving to "check on" the Defendant. Approximately five min-

utes later, Mr. Head saw the Defendant and another man in an altercation between the two houses.[4] At that time, Mr. Head's wife arrived home from a shopping trip. Mrs. Vaughn then returned to Mr. Head's house, and as the three adults stood in his kitchen, there was a knock on the door. When Mr. Head opened it, the Defendant, who had blood on his chest, "fell into the kitchen" and "mumbled" that "she had stabbed him or something." Mr. Head tried to talk to him, but the Defendant "was not in his right state of mind." The Defendant mentioned something regarding a potato peeler, and he appeared to be semi-conscious.

Mr. Head's wife, Denise Head, testified that on the evening of the shooting, she returned home from a shopping trip with her friend (Paula Fisher). Before she went inside, she saw the Defendant and another man "playing ... or pulling on something, or struggling" behind her house. After she went in the house and joined Mr. Head and Mrs. Vaughn in the kitchen, the "door opened and [the Defendant] fell in screaming, crawling in, pretty much. He had blood on [his] front." The Defendant was "frantic," and his "eyes were rolling back in his head." At some point thereafter, Mrs. Head slapped the Defendant in an effort to keep him conscious. She believed that he "was messed up ... on drugs or something," and she placed the 9-1-1 call that alerted authorities to the situation.

Mrs. Head's friend, Paula Fisher, testified that as she drove up to Mrs. Head's house after their shopping trip on the day of the shooting, she saw the Defendant "struggling and wrestling" with another man in the street. The two men were "tugging back and forth for something"

---

4. There is no indication in the record regarding the identity of the man with whom the Defendant was struggling. However, Mr. Head's wife and her friend, Paula Fisher, also witnessed the altercation between the Defendant and the unidentified individual.

that Ms. Fisher could not see. At that time, she did not notice anything on the Defendant's shirt.

Perry County paramedic Beth Jackson testified that she responded to Mrs. Head's 9–1–1 call and described the Defendant's behavior as follows:

> When I walked into the room, [the Defendant] was laying face-down in the floor, and I approached [him], and before I could ever kneel down there to him, he kind of like came up on his knees, crawled a couple of steps and then, like, grabbed a woman that was to his left, grabbed her by her pants and pulled her pants down. And she leaned over to pull her pants back up and he grabbed a hold of her jacket and pulled her down further and whispered something in her ear.

Once Jackson began administering aid to the Defendant, he said repeatedly, "She stabbed me." Jackson observed two "shallow" stab wounds to the Defendant's chest, but she did not have to treat them because they had already stopped bleeding on their own. In Jackson's opinion, the wounds were too "narrow" to have been made by a knife.

Jackson asked the Defendant if anyone else had been stabbed, and he said, "No." However, once they were in an ambulance en route to a hospital, the Defendant told her that his "sister"[5] had been shot and said that Hester had the gun. At the hospital, Jackson saw a shell casing fall out of the Defendant's pocket.

Sergeant Robert Dillingham of the Perry County Sheriff's Department testified that he was dispatched to the scene of the shooting at approximately 6:00 p.m.; he was the first officer to arrive. When he arrived, the Defendant was being tended to by paramedics on the Heads' kitchen floor. Mrs. Head told Sergeant Dillingham that gunshots had been fired at the Defendant's residence. After the Defendant was secured in an ambulance, Sergeant Dillingham proceeded to the Defendant's house. Sergeant Dillingham discovered a bloody pillowcase and bed sheet on the ground outside the Heads' door.

Sergeant Dillingham and a deputy went through every room in the Defendant's house, finding no one inside. A large amount of green powder was on the floors:

> It was all over the living room, the living room floor, tables, shoes, couch, it was in the dining room on some tools that were sitting back there. There was some clothes that were laying back there in the floor that had [the powder] all over them. And in the bedroom [the powder] was all over the floor around the bed and laying in the floor.

The officers found the victim lying across a sidewalk outside the kitchen door. Sergeant Dillingham felt for a pulse and concluded that she did not have one. He observed a knife lying on the center of the victim's chest. There was "a substance that looked like blood" on the knife. Medical personnel arrived and took the victim away. The sergeant and deputy then found Hester in the shed and took him into custody.

Paramedic Pat Gant testified that she responded to the scene of the shooting and administered aid to the victim. According to Gant, the victim still had a faint pulse, but she died on the way to the hospital.

Dr. Andrew K. Averett testified that he was working in the emergency room to which both the victim and the Defendant

**5.** Testimony presented at a bond reduction hearing indicated that the victim was the sister of the Defendant's ex-wife.

were transported. Dr. Averett pronounced the victim dead on arrival, and he observed that the Defendant had two "small stab wounds" to his chest. The Defendant's wounds were not serious and had stopped bleeding before he arrived at the hospital.

Two law enforcement investigators spoke with the Defendant while he was in the emergency room. Dr. Averett overheard some of their conversation and described it as follows:

[Investigator] Tenry walked up to the foot of the bed and said, "[Defendant], what happened?" And [the Defendant] said, "I shot her." And [Investigator Tenry] said, "Why'd you shoot her?" And [the Defendant] said, " 'Cause she's been lying to me." And [Investigator Tenry] said, "About what?" [The Defendant] [s]aid, "She's been running around."

Medical examiner Dr. Staci Turner testified that she performed the victim's autopsy and that her death was caused by gunshot wounds. The fatal bullet passed through her right arm, entered her chest cavity, and penetrated her heart and a lung. Dr. Turner was able to recover that bullet, and she turned it over to the Tennessee Bureau of Investigation. The victim was also shot once in the hip and five more times in the pelvic region, giving her a total of seven gunshot wounds. The gunshot wounds to her pelvic region (those passing through her buttocks, pubic mound and vagina) were inflicted from behind, and the victim could have been in a crawling position when one of those wounds was inflicted.

Analysis of the victim's blood revealed that she had phencyclidine (PCP) in her system. Dr. Turner testified that PCP is an illegal drug that can have varying effects on users, stating that "it can affect the same person differently when they take it. It can cause hallucinations, bi-zarre behavior, that type of thing." The doctor agreed that PCP could have mild effects or make a user "do absolutely crazy, irrational things."

Investigator Jerry Tenry of the Tennessee Bureau of Investigation testified that he was dispatched to the hospital while the Defendant was there on the day of the shooting. When he first approached the Defendant and asked what happened, the Defendant said, "I shot her." The investigator asked why, and the Defendant responded, "The bitch lied to me and I shot her." While at the hospital, Investigator Tenry recovered a shell casing from the Defendant's shoe.

After leaving the hospital, Investigator Tenry went to the scene of the shooting. Asked whether he noticed anything unusual at the Defendant's house, investigator Tenry responded as follows:

Yes there was. There was—as soon as you walked in the door it was a white powder all over literally everything, it was on the couches, it was on the floor in the living room, and as you went into the kitchen, that white powder was all over the kitchen floor, on the table, on the cabinet, on the washed dishes, and into that first bedroom on the right there was that white powder on the floor in there too.

The powder was determined to be Comet, which is a powder cleanser. According to Investigator Tenry, the Comet appeared as though it had been "freshly sprinkled," but there were "shoe tracks all over it." An empty can of Comet was found on a couch near the kitchen.

Investigator Tenry also testified that the knife found with the victim's body was still lying on the sidewalk behind the Defendant's house, although the body had been removed. He also discovered a Smith and Wesson, .40 caliber, semi-automatic pistol along with another knife under a blanket on the floor in a bedroom. Additionally,

two shell casings from .40 caliber cartridges were recovered from the kitchen area, as well as two from the bedroom. A pistol holster covered in Comet was also found on the floor in the kitchen. Another semi-automatic pistol (a .45 caliber Llama) was recovered in some weeds outside the Defendant's house. This pistol was unrelated to the victim's death.

Two Special Agent Forensic Scientists with the Tennessee Bureau of Investigation testified that they analyzed samples of the Defendant's blood for the presence of alcohol, as well as "about seventy-five to eighty" different kinds of drugs. The samples were negative. The agent who tested the Defendant's blood for the presence of illegal drugs was not specifically asked whether PCP was one of the drugs the test would have detected. The Tennessee Bureau of Investigation's toxicology report showed that the Defendant's blood was tested for the presence of barbiturates, benzodiazepines, cannabinoids, cocaine, and opiates.[6]

Another special agent with the Tennessee Bureau of Investigation, Robert E. McFadden, testified that he was unable to lift any latent fingerprints from the .40 caliber pistol or any other items recovered from the scene. Agent McFadden also stated that if an object is covered in "any powder substance," the powder would "distort any possibility of being able to get good prints."

Charles Hardy, also of the Tennessee Bureau of Investigation, testified that he tested the knife discovered with the victim's body for the presence of blood and other bodily fluids. He found "three, small stains" near the hilt of the knife,

which he described as "a small, wood-handle paring knife, about seven inches overall." The stains were blood, but because the amount was so small, he could not determine whether the blood was human. No blood was present on the knife found in the bedroom. However, human blood was present on the sidewalk where the victim was found, on the living room couch, on a heater in the front bedroom, and on the exterior of a pickup truck parked outside the Defendant's house. Agent Hardy's testimony did not connect any of the blood found with any particular person.

Tennessee Bureau of Investigation Agent Teri Arney testified that he conducted comparison tests on the .40 caliber Smith and Wesson pistol recovered from inside the house and the bullet the medical examiner removed from the victim's body. The bullet taken from the victim's body was fired from that pistol. The shell casing discovered in the Defendant's shoe at the hospital had also been fired by the .40 caliber pistol, as were all the shell casings recovered from inside the house. Further, based on gunshot residue tests Agent Arney conducted on the victim's pants, he concluded that the gunshots to her pelvic region were inflicted from behind and that they were fired from a distance of less than eighteen inches.

The Defendant did not testify or present evidence.

Following deliberations, the jury found the Defendant guilty of first degree murder. The same day, a separate sentencing hearing was held before the Defendant's jury because the State sought the enhanced punishment of imprisonment for life without the possibility of parole.[7] The

6. In a motion for resources necessary to prepare a defense, the assistant public defender who originally represented the Defendant stated that the Defendant's blood was taken while he was in the hospital. The motion further stated that his "blood was sent to the

TBI laboratory and a alcohol/toxicology request was sent requesting testing for PCP. However, the TBI lab did not test for PCP."

7. In Tennessee, there are three punishments for first degree murder: (1) life; (2) life with-

jury declined to impose the enhanced sentence, and the Defendant received a life term. The Defendant's motion for a new trial was subsequently denied, and this appeal followed.

## ANALYSIS

### I. Timeliness of the Defendant's motion for a new trial

■■■ Initially, we address the State's argument that this Court should dismiss the Defendant's appeal because his motion for a new trial was untimely filed. Tennessee Rule of Criminal Procedure 33(b) mandates that a defendant's motion for a new trial must be made within thirty days of the date the order of sentence is entered:

> A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days *of the date the order of sentence is entered.* The court shall liberally grant motions to amend the motion for new trial until the day of the hearing on the motion for a new trial.

Tenn. R.Crim. P. 33(b) (emphasis added). A trial court does not have jurisdiction to rule on a motion filed outside the thirty-day period. *State v. Bough,* 152 S.W.3d 453, 460 (Tenn.2004). Consequently, "[i]f a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing." *Id.* (citing *State v. Martin,* 940 S.W.2d 567, 569 (Tenn.1997)); *see also* Tenn. R.App. P. 3(e). Further, this Court does not have the authority to waive the untimely filing of a motion for a new trial. *State v. Givhan,* 616 S.W.2d 612, 613 (Tenn.Crim. App.1980); *see also* Tenn. R.App. P. 4(a).

In this case, the jury decided the Defendant's sentence, and the trial court ordered his life term on August 18, 2006. However, the trial court clerk did not enter the judgment of conviction document until August 25, 2006, and that is the file-stamp date which appears on the actual judgment form. The Defendant's motion for a new trial was filed on September 25, 2006. The State contends that the thirty-day time period for filing the motion for a new trial began on August 18, 2006, when the trial court announced the sentence, and therefore the Defendant's motion was not timely filed. The Defendant asserts that the thirty-day time period began on August 25, 2006, the day the trial court clerk entered and file-stamped the judgment of conviction.

With August 25, 2006, as the starting date, the Defendant would have had until September 25, 2006, (the day the motion was filed) to file a motion for a new trial because September 24, 2006, was a Sunday. *See* Tenn. R.Crim. P. 45(a)(2)(A) (providing that if a rule-specified period of time ends on a Sunday, the time period for filing extends to the end of the next day).

This Court recently addressed this precise issue. *See State v. Kirby Stephens,* 264 S.W.3d 719, 727-29 (Tenn.Crim.App., Nashville, Sept. 21, 2007) (providing a thorough and detailed analysis of the court rules, statutes, and judicial opinions affecting the determination of the "date" on which the order of sentence is entered for purposes of calculating the thirty-day period for the timely filing of a motion for a new trial), *perm. to appeal denied,* (Tenn. Apr. 14, 2008). This Court ruled that "the effective date for entry of a judgment or order of sentence is the date of its filing with the court clerk after being signed by the judge." *Id.* at 729. Accordingly, in this case, the thirty-day time period at issue began on August 25, 2006, when the Defendant's judgment of conviction was filed by the trial court clerk. As such, we conclude that his motion for a new trial

---

out the possibility of parole; and (3) death.

*See* Tenn.Code Ann. § 39–13–202(c)(1)–(3).

was timely filed, and all the issues appealed are properly before this Court.

## II. Sufficiency of the evidence

■ On appeal, the Defendant argues that the evidence presented to the jury was not sufficient to support his conviction for premeditated first degree murder. Specifically, he contends that the State failed to present adequate evidence establishing that the killing was premeditated. He avers that analysis of the appropriate factors bearing on the issue of premeditation reveals that the murder was not premeditated.

■ Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans,* 108 S.W.3d 231, 237 (Tenn.2003); *State v. Carruthers,* 35 S.W.3d 516, 557–58 (Tenn.2000); *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn.1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Hall,* 8 S.W.3d 593, 599 (Tenn.1999).

■ On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom.

*See Carruthers,* 35 S.W.3d at 558; *Hall,* 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland,* 958 S.W.2d 651, 659 (Tenn.1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans,* 108 S.W.3d at 236; *Bland,* 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans,* 108 S.W.3d at 236–37; *Carruthers,* 35 S.W.3d at 557.

■ First degree murder, as relevant to this appeal, is defined as a premeditated and intentional killing of another. *See* Tenn.Code Ann. § 34–13–202(a)(1). The definition of first degree murder includes a subdivision on the meaning of "premeditation:"

As used in subdivision (a)(1), "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn.Code Ann. § 39–13–202(d). Further, our supreme court has ruled that "[t]he element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young,* 196 S.W.3d 85,

108 (Tenn.2006) (citing *State v. Bland,* 958 S.W.2d 651, 660 (Tenn.1997)); *see also State v. Davidson,* 121 S.W.3d 600, 614 (Tenn.2003); *State v. Suttles,* 30 S.W.3d 252, 261 (Tenn.2000). In other words, "[a]lthough a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." *State v. Jackson,* 173 S.W.3d 401, 408 (Tenn.2005) (citing *Bland,* 958 S.W.2d at 660).

 Our high court has also identified some specific circumstances that support a finding of premeditation:

[D]eclarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

*Id.* (citing *State v. Nichols,* 24 S.W.3d 297, 302 (Tenn.2000)). A defendant's failure to render aid to a victim can also indicate the existence of premeditation. *State v. Lewis,* 36 S.W.3d 88, 96 (Tenn.Crim.App.2000) (other citations omitted). In addition, if a motive is established for the killing, the jury may also infer premeditation from that factor. *Jackson,* 173 S.W.3d at 408 (quoting *State v. Leach,* 148 S.W.3d 42, 54 (Tenn.2004)).

In the light most favorable to the State, the evidence showed that the Defendant and the victim had argued on the morning of the killing, and he was angry with her because she was having sexual relations inside his house.[8] Several hours later, they argued again, and at some point during their argument, the Defendant armed himself with a deadly weapon (a .40 caliber pistol) and shot the unarmed victim seven times at close range. Perhaps as many as five of the shots were fired while the victim was on the ground or trying to crawl away. Thereafter, the Defendant attempted to secrete or dispose of the weapon. He sprinkled Comet cleanser around the scene in an apparent attempt to impede an investigation of the scene. Further, the Defendant stabbed himself to bolster a claim that he acted in self-defense. Finally, the Defendant did not alert emergency personnel to the victim's condition when they arrived on the scene. Rather, he chose to dramatize and exaggerate his minor wounds instead of directing the paramedics to aid the victim.

We conclude that this evidence viewed in its entirety was sufficient for a rational trier of fact to find that the Defendant was guilty of first degree premeditated murder beyond a reasonable doubt.

### III. Failure of trial court to force public defender to assist trial counsel

The Defendant also contends that the trial court erred by not requiring the assistant public defender to assist trial counsel throughout the trial. He avers that the trial court should have ordered the assistant public defender to continue to assist the Defendant during his trial because of her particular knowledge of his case, and because trial counsel only had a short time to prepare for trial and review "the voluminous amount of documents."

 In this case, the trial court did specifically order the assistant public defender to assist during the selection of a jury and in opening statements. Moreover, we agree with the State that the Defendant has waived review of this issue by failing to cite any legal authority in support of his argument. *See* Tenn. Ct. Crim.App. R. 10(b) ("[i]ssues which are not

---

**8.** The Defendant's statement to authorities at the hospital that he "shot the bitch because she lied to [him]" also provides evidence of his motive for the killing.

supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also* Tenn. R.App. P. 27(a)(7) (stating that an appellant's appellate brief shall contain an argument which includes "citations to the authorities and appropriate references to the record...."). We conclude that the Defendant is not entitled to relief based on the failure of the trial court to order the assistant public defender to assist retained counsel at trial. This issue is without merit.

## IV. Trial court's denial of a continuance one week before trial

The Defendant also argues that the trial court erred by denying his request for a continuance. The motion was made one week before the scheduled trial date, when his family hired a private attorney to represent him in the place of the assistant public defender. He argues that "trial counsel was not afforded a reasonable opportunity to investigate and prepare for trial." Accordingly, he asserts that by denying his request for a continuance, the trial court abused its discretion and violated his constitutional rights to the effective assistance of counsel and due process of law.

The Defendant was arrested on the day after the shooting, February 18, 2005; he was not able to post bond and remained incarcerated from that point forward. An assistant public defender was appointed to represent him, and his indictment was issued on January 23, 2006. On February 13, 2006, the State and the defense submit-

ted a joint motion to the court for a continuance of the trial date from March 1, 2006, until August 16, 2006, and the trial court entered an agreed order scheduling his trial for August 16, 2006. This was the only continuance granted.

Through a collective effort of the Defendant's extended family, trial counsel (a private attorney) was hired to represent the Defendant seven days before the scheduled trial date. On August 10, 2006, the trial court granted the Defendant's motion to substitute trial counsel for the assistant public defender. In the order granting the substitution, the trial court also denied the Defendant's request for a continuance and withdrew funds allotted for the Defendant to hire an expert witness which had been granted by the trial court the day before, stating as follows: "Further, the [trial court] finds that the Defendant's previous application for the [trial court] for the payment of fees necessary to evaluate his competency for trial should be withdrawn since he has opted to hire private counsel."

On August 14, 2006, trial counsel filed a renewed motion for a continuance and submitted his own affidavit in support of the motion. Among other statements, trial counsel's affidavit explained that he had "not had sufficient time to review this case and interview potential witnesses." Further, trial counsel set out that "[t]he [d]efense of [the Defendant] would be aided by having an expert witness testify as to the mental condition of the Defendant, as has been more particularly set forth in a previous [a]ffidavit filed with this [c]ourt." [9]

9. The referenced affidavit, that of Dr. Keith Caruso, a psychiatrist, was re-filed with the renewed motion on August 14, 2006. Therein, Dr. Caruso states the following regarding the Defendant's drug use:

[T]he Defendant has a history of psychotic behavior due to the ingestion of PCP, previously severe enough to prompt a psychiatric admission to Middle Tennessee Mental

Health Institute (MTMHI). Medical records apparently indicate that the Defendant had told medical professionals who had attended to his injuries on the night of the offense that he had ingested PCP on the night of the alleged offenses. As a result of his voluntary intoxication, the Defendant may have been unable to appreciate the nature or wrongfulness of his actions at the

Trial counsel asserted that because the trial court withdrew the funds approved to hire an expert, he would not be able to retain one nor would his family be able to obtain the necessary funds prior to the August 16, 2006 trial date. Moreover, trial counsel stated that "[e]ven if the funds were available to hire the expert, the expert could not interview and evaluate the Defendant prior to the trial date...." Lastly, trial counsel put forth that the Defendant's "defense will be adversely affected if this case goes to trial on August 16, 2006."

Also on August 14, 2006, the trial court denied the motion by written order:

> Approximately one week prior to the trial of this case, this [c]ourt received a Motion to Substitute Counsel. Apparently, the Defendant acted on his own without any consultation with his previous attorney, [assistant public defender]. Counsel should not take a case which has been set for trial without being prepared to try the case on that date. Accordingly, for this reason, the Defendant's Motion to Continue is not well taken. The [c]ourt does direct [the assistant public defender] to assist [trial counsel] in preparation for and at the trial, during jury selection and opening statements, if requested.

> The second ground for Defendant's motion concerns an expert witness.

> The [c]ourt was presented with a Motion by the Defendant's prior counsel requesting an expert witness to give an opinion regarding Defendant's diminished capacity due to his alleged use of PCP. In addition to the Defendant's questionable indigenc[e], this [c]ourt further finds the use of PCP is irrelevant to a claim for diminished capacity in that psychiatric testimony must demonstrate that the Defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. *State v. Hall*, 958 S.W.2d 679, 688 (Tenn.1997).

> Moreover, in 2005, the Defendant was evaluated by Agreed Order between the State and the Public Defender. The results of that evaluation were set forth in a letter to the parties on July 21, 2005, which stated Defendant had the requisite mental state to commit the offense charged.

> In the event Defendant is now trying to question the results of the mental evaluation of July 2005, the Court finds that Defendant's request is too late.

> For the above reasons, the Defendant's Motion to Continue is Denied.

Accordingly, the Defendant's trial began as scheduled on August 16, 2006.

The United States Supreme Court specifically addressed a trial court's discretion in ruling on a motion to continue as it relates to the Sixth Amendment right to the effective assistance of counsel in *Mor-*

time of the offense or may have rendered him unable to form the requisite *mens rea* for the alleged actions in accordance with criteria listed in *State v. Hall* and T.C.A. 39–11–503.

At an October 5, 2005 bond reduction hearing, the Defendant testified that he was on PCP the day of the killing, that he had been addicted to PCP since he was fifteen years old, and that he had previously received mental health treatment for the addiction while living in California. At the bond hearing, the

Defendant's brother testified that the Defendant was addicted to PCP. Mrs. Vaughn also testified at the bond hearing that the Defendant was addicted to PCP and used it on the day of the killing. An investigator from the Twenty–First District Attorney General's Office, Barry Carroll, testified that he saw the Defendant at the hospital that evening and believed he was under the influence of "something" because of the way he was "talking off the wall" and engaging in odd behavior (attempting to forcibly remove a catheter).

ris v. Slappy, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), stating as follows:

> Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. *See Chambers v. Maroney,* 399 U.S. 42, 53–54, 90 S.Ct. 1975, 1982–83, 26 L.Ed.2d 419 (1970). Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. *Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel. Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964).

*Morris,* 461 U.S. at 11–12, 103 S.Ct. 1610 (emphasis added);[10] *see also United States v. Carrera,* 259 F.3d 818, 824–25 (7th Cir.2001) (stating that evaluation of whether a trial court's decision to deny a continuance was unreasoned and arbitrary should take into account the circumstances of the ruling and the reasons cited by the trial court for denying the continuance) (citing *United States v. Santos,* 201 F.3d 953, 958 (7th Cir.2000)).

Whether a continuance should be granted in a criminal trial is a decision which rests within the discretion of the trial court. *State v. Blair,* 145 S.W.3d 633, 640 (Tenn.Crim.App.2004) (citing *State v. Morgan,* 825 S.W.2d 113, 117 (Tenn.Crim. App.1991)). This Court will only reverse a trial court's denial of a motion to continue "if it appears that the trial court abused its discretion to the prejudice of the defendant." *State v. Odom,* 137 S.W.3d 572, 589 (Tenn.2004) (citing *State v. Hines,* 919 S.W.2d 573, 579 (Tenn.1995)); *see also State v. Russell,* 10 S.W.3d 270, 275 (Tenn. Crim.App.1999). In order to establish an abuse of discretion, a defendant must show that the denial of the requested continuance "denied the defendant a fair trial or that the result of the trial would have been different." *Id.* (citing *State v. Mann,* 959 S.W.2d 503, 524 (Tenn.1997)); *see also State v. Thomas,* 158 S.W.3d 361, 392 (Tenn.2005). In other words, "[i]n order to reverse the judgment of the trial court, [this Court] must be convinced that the defendant 'did not have a fair trial and that a different result would or might reasonably have been reached had there been a different disposition of the application for a continuance.'" *State v. Goodwin,* 909 S.W.2d 35, 44 (Tenn.Crim.App.1995) (quoting *Baxter v. State,* 503 S.W.2d 226, 230 (Tenn.Crim.App.1973)). Further, the defendant bears the burden of showing that harm resulted from the denial of the requested continuance. *State v. Arlie Thomas,* No. M2004–01538–CCA–R3–CD, 2006 WL 1446842, at *15 (Tenn.Crim.App., Nashville, May 22, 2006) (citing *Baxter,* 503 S.W.2d at 230).

In this case, the Defendant was charged with first degree murder, and the State sought the enhanced punishment of life without the possibility of parole. The trial

---

**10.** In *Morris,* the Court upheld the trial court's denial of a motion for a continuance made by the defendant. In that case, the Defendant's original attorney was hospitalized shortly before trial and another public defender was assigned to represent him six days before trial. *See Morris,* 461 U.S. at 1, 103 S.Ct. 1610. However, substitute counsel in *Morris* repeatedly assured the trial court that he was ready to proceed, and a continuance would be of no benefit. *Id.* The defendant himself wanted a continuance, not substitute counsel. *Id.*

court was presented with a renewed motion for a continuance—two days before the scheduled beginning of the trial—which was supported by trial counsel's affidavit stating that because he was recently hired by the Defendant's family, he had not had sufficient time to review the case or interview witnesses. Trial counsel also stressed that the defense would be aided by the testimony of an expert bearing on the issue of voluntary intoxication by the ingestion of PCP, and trial counsel stated that without a continuance, no expert could be retained. The trial court denied the motion, specifically stating that the reason for the denial was that trial counsel "should not take a case which has been set for trial without being prepared to try the case on that date." Further, the trial court ruled that the desired expert testimony would not be admissible under our supreme court's opinion in *State v. Hall,* 958 S.W.2d 679 (Tenn.1997).

Based on this record, we cannot conclude that the trial judge abused his discretion by denying the continuance based on trial counsel's asserted need for more time to investigate, interview witnesses, and otherwise prepare for trial. Although this first degree murder trial was not a simple case, the facts surrounding the actual killing were not complex. Counsel had six days to prepare. The assistant public defender was directed to assist, and trial counsel did not appeal to the trial court to enforce that order.

Putting aside the issue of the withdrawal of funds for the expert witness, we would not conclude that the denial of the continuance worked to deprive the Defendant of a fair trial or that the result of the trial would have been different if the continuance had been granted. However, as set out below, we conclude that the trial court's simultaneous revocation of the previously approved expert witness funds was

an error that does necessitate that relief be granted to the Defendant.

## V. Revocation of funds to hire an expert

In a closely related issue, the Defendant avers that the trial court erred by revoking an order approving funds to hire a psychiatrist that the court had previously approved. More specifically, he asserts that it was error for the trial court to determine he was no longer indigent because his family hired a private attorney. Further, the Defendant contends that the trial court misinterpreted *State v. Hall* in revoking the funds because *Hall* does not prohibit the type of expert testimony offered by the Defendant. The Defendant also puts forth that the issue of voluntary intoxication was fairly raised by the motion to secure state funding for an expert witness and the corresponding affidavit of Dr. Caruso. And, as a result of the trial court's misinterpretation of *Hall* and revocation of funding, the Defendant claims he was denied the opportunity to present a viable defense to the charge of first degree murder.

In order to preserve an indigent defendant's right to the due process of law, he or she may be entitled to the assistance of a state-funded psychiatric expert in appropriate circumstances. *See State v. Barnett,* 909 S.W.2d 423, 428–31 (Tenn.1995); *see also* Tenn. S.Ct. R. 13 § 1(a)(1)(E), § 5(a)(1); *Ake v. Oklahoma,* 470 U.S. 68, 77–80, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Barnett,* the supreme court explained that a defendant must make a threshold showing of a particularized need before such expert assistance will be provided by the state:

[B]efore an indigent defendant is entitled to the assistance of a state-funded psychiatric expert, the defendant must make a threshold showing of particular-

ized need. To establish particularized need, the defendant must show that a psychiatric expert is necessary to protect his right to a fair trial. Unsupported assertions that a psychiatric expert is necessary to counter the State's proof are not sufficient. The defendant must demonstrate by reference to the facts and circumstances of his particular case that appointment of a psychiatric expert is necessary to insure a fair trial.

*Id.* at 431. Whether a defendant meets this threshold showing is a determination to be made by the trial court on a case by case basis. *Id.* In making the determination as to "whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made." *Id.*

 In this case, it appears to be uncontested that the Defendant made an adequate showing of particularized need. Indeed, the State concedes in its brief that "to the extent that there was evidence that the Defendant was under the influence of PCP at the time he shot the victim, it would have been appropriate for the trial court to approve funds for an expert to determine whether the drug interfered with the Defendant's ability to kill the victim intentionally and with premeditation."[11] The issue before us is whether the trial court erred by revoking approval of funds to hire an expert because the Defendant's family hired a private attorney.

Before trial counsel was hired, the assistant public defender filed a motion with the trial court seeking the approval of

funds to hire an expert psychiatrist in order to investigate and prepare a defense relating to the Defendant's mental condition at the time of the shooting. The motion stated that the Defendant was under the influence of PCP at the time of the offense and that the Tennessee Bureau of Investigation had not tested his blood for the presence of PCP, although the bureau had been requested to do so. On August 9, 2006, the trial court granted the Defendant's motion. In its order authorizing funds for expert services, the trial court stated that "this case is a complex non-capital case for which the [d]efense is in need of expert and similar services to ensure the constitutional rights of the Defendant are protected." The trial court recognized that the Defendant had consulted with Dr. Keith A. Caruso and specifically approved the funds for his hire. However, as set out above, when trial counsel was retained, the trial court withdrew its authorization for the funds. Implicit in the trial court's order withdrawing the funds is a finding that the Defendant was no longer indigent because his family had hired private counsel.

 A defendant's status as an indigent is not automatically lost because a private attorney is retained. *See State v. Dubrock,* 649 S.W.2d 602, 605 (Tenn.Crim. App.1983) (finding that the defendant should have been afforded an indigency hearing when he put the trial court on notice prior to trial that he was then unable to pay for a lawyer, even though he had previously retained an attorney). Moreover, "[t]he financial condition of a

---

11. However, the State does argue that the evidence adduced at trial established that the Defendant was not under the influence of drugs at the time of the killing. Our thorough review of the record on this point leads us to disagree with the State. The drug testing conducted by the TBI does not appear to have specifically ruled out the possibility that the

Defendant was on PCP, although it does conclusively establish that he was not under the influence of other drugs (barbiturates, benzodiazepines, cannabinoids, cocaine, and opiates). Moreover, other evidence presented at trial tends to support the averment that the Defendant had been ingesting PCP that day.

defendant's relatives has no bearing on the question of the defendant's solvency." *State v. Gardner*, 626 S.W.2d 721, 724 (Tenn.Crim.App.1981) (citing *Sapio v. State*, 223 So.2d 759, 760–61 (Fla.App. 1969)); *see also State v. Robert Miller*, No. W2002–00640–CCA–R3–CD, 2003 WL 1618070, at *4–6 (Tenn.Crim.App., Jackson, Mar. 28, 2003). Consequently, it was error for the trial court to tacitly find that the Defendant was no longer indigent because his family was able to hire a private attorney to represent him. Before concluding the Defendant was no longer indigent, and therefore revoking the previously authorized funds to hire a psychiatric expert, the trial court should have held an indigency hearing. *See Dubrock*, 649 S.W.2d at 605. Furthermore, the record reflects that after the motion for new trial was denied, trial counsel was allowed to withdraw because he had not been retained to represent the Defendant on appeal. The trial court then appointed current counsel to represent the Defendant on appeal.

■ Furthermore, in our view, the trial court misinterpreted *State v. Hall* by concluding that it proscribed admission of the expert testimony proffered by the Defendant. The *Hall* court explained that expert psychiatric testimony bearing only on personality types and character traits is not admissible, but that expert testimony showing "that because of a mental disease or defect, a defendant lack[s] the capacity to form the mental state required to constitute the offense for which he or she is being tried" could be admissible, assuming all other evidentiary requirements are satisfied. *Hall*, 958 S.W.2d at 692. This holding did not preclude the admission of expert, psychiatric testimony bearing on the issue of voluntary intoxication as it affects an individual's ability to form the requisite mens rea to commit a crime. *See Hall*, 958 S.W.2d at 691 (noting that the inadmissible psychiatric testimony offered

in that case was not "relevant to show that the defendant lacked the capacity to form the requisite intent because of mental disease or defect *or intoxication*." (emphasis added)). Indeed, the trial court in *Hall* specifically ruled that the expert in that case would have been permitted to provide testimony and opinion "as to the extent of the state of intoxication of [the defendant] at the time of the commission of the offense," and the high court expressed approval of the trial court's ruling. *See id.*

In Tennessee, voluntary "intoxication itself is not a defense to prosecution for an offense. However, intoxication, whether voluntary or involuntary, is admissible in evidence, if it is relevant to negate a culpable mental state." Tenn.Code Ann. § 39–11–503(a). Our supreme court has previously explained that evidence of voluntary intoxication can be considered by a jury when deciding whether a first degree murder defendant had the specific intent to kill:

> Voluntary intoxication is never a justification for a crime but its existence may negate a finding of specific intent. *State v. Bullington*, 532 S.W.2d 556, 560 (Tenn.1976). If the accused is so intoxicated that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree; and, even when an intoxicated defendant is capable of forming specific intent, his [intoxication] may be considered in determining whether he specifically intended the particular act for which he is on trial. *Id.*

*State v. Adkins*, 653 S.W.2d 708, 713 (Tenn.1983); *see also State v. Butler*, 900 S.W.2d 305, 310–11 (Tenn.Crim.App.1994) (voluntary intoxication is not a defense to second degree murder); *State v. Kelly*, 697 S.W.2d 355, 358–59 (Tenn.Crim.App.1985); *State v. Bell*, 690 S.W.2d 879, 882 (Tenn. Crim.App.1985) (stating that whether a de-

fendant was so intoxicated as to be unable to form a premeditated and deliberate design to kill is a question for the jury).

Consequently, we conclude that expert testimony bearing on the issue of whether the Defendant was intoxicated was relevant evidence and properly admissible under *Hall.* The questions of whether the Defendant in this case was under the influence of PCP at the time of the offense, and if so, whether his intoxication had any bearing on his ability to premeditate and form the intent to kill, were questions appropriate for the jury's consideration. However, the trial court's ruling revoking the funds for the Defendant to hire Dr. Caruso effectively prevented him from presenting the defense of voluntary intoxication at his trial.

■■■ The Sixth Amendment and Due Process Clause of the Fourteenth Amendment to the United States Constitution "clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." *State v. Brown,* 29 S.W.3d 427, 432 (Tenn.2000) (citing *Taylor v. Illinois,* 484 U.S. 400, 408, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)) (other citations omitted). The United States Supreme Court explained the nature of this right in *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1976), as follows:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This

right is a fundamental element of due process of law.

*Id.; see also State v. Flood,* 219 S.W.3d 307, 315–16 (Tenn.2007); *Brown,* 29 S.W.3d at 432 (quoting the same language from *Washington* and citing to numerous other United States Supreme Court opinions, as well as opinions from several other jurisdictions bearing on this right).

In the present case, we conclude that the evidence on voluntary intoxication sought to be introduced by the Defendant through Dr. Caruso was critical to his defense on the charge of first degree murder. As a result, the trial court's error in revoking its order approving funds for an expert witness denied the Defendant his constitutional right to present a defense. *See Brown,* 29 S.W.3d at 432–34.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the Defendant was denied his constitutional right to present a defense on the issue of voluntary intoxication. Consequently, we reverse the judgment of the trial court and remand this case for a new trial.