IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 12, 2014 Session

## DEREK WILLIAMSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Sumner County**
**No. 272-2013    Dee David Gay, Judge**

---

**No. M2014-00183-CCA-R3-PC - Filed April 14, 2015**

---

The Petitioner, Derek Williamson, appeals the Sumner County Criminal Court's denial of his petition for post-conviction relief from his conviction for first degree murder and his life sentence. He contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Donald E. Dawson, Nashville, Tennessee, for the appellant, Derek Williamson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; and Lawrence Ray Whitley, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### Conviction Proceedings

The Petitioner was convicted of the June 18, 2008 first degree premeditated murder of Grady Carter. The evidence at the trial showed that the victim and Adrian Holmes had been involved romantically from 2001 until August 2007 and shared custody of their son. The Petitioner and Ms. Holmes became involved romantically in the fall of 2007 and began living together in November 2007. That same month, the victim began harassing the Petitioner with demeaning and threatening text messages, which continued until May 2008.

Three days before the crime, the victim forwarded text messages he had received from Ms. Holmes to the Petitioner. In the original messages, Ms. Holmes suggested that she and

the victim reconcile and be a family. The next day, the victim and the Petitioner met at Ms. Holmes's urging to discuss the meaning of the messages. The victim told the Petitioner that Ms. Holmes had been coming to his house more often and had been staying longer when she dropped off their child. The Petitioner told the victim that he and Ms. Holmes had been having problems related to "the way she acted about her phone." The victim told the Petitioner he would never "forget it" or forgive him.

The day before the crime, the Petitioner and Ms. Holmes argued. The Petitioner decided to end the relationship and move out of their apartment, although he did not immediately move. The next day, the Petitioner and Ms. Holmes were spending the evening together at their apartment when Ms. Holmes received a text message from the victim containing a video recording of the child. The Petitioner and Ms. Holmes argued about the victim's sending her messages. The Petitioner grabbed her cell phone and threw it across the room, shattering the screen. The Petitioner punched a hole in a wall. They argued further, and Ms. Holmes called the victim and asked him to speak to the Petitioner about the matter. The Petitioner refused to speak to the victim. The victim called the Petitioner's cell phone, but the Petitioner did not answer. The victim left a threatening message. The Petitioner retrieved a loaded gun from the kitchen, told Ms. Holmes, "I hope you're happy; you just got him killed," and left the apartment. Ms. Holmes called a relative who lived in the victim's neighborhood to warn the relative that the Petitioner was mad, had a gun, and was headed to the neighborhood. She asked the relative to get her son out of the victim's house. She also called the victim and warned him that the Petitioner was upset and had a gun.

The victim was outside his house talking angrily on the phone. He told others present that he had been waiting a long time and was going to "kick [the Petitioner's] a--." Minutes later, the Petitioner pulled in front of the victim's driveway. The victim put up his hands and asked, "What's up?" The Petitioner opened his car door, took out a gun, and fired multiple shots at the victim. The Petitioner drove away. Brandon Clark, a sheriff's deputy and a friend of the Petitioner, spoke with the Petitioner by telephone and urged him to turn himself in to the authorities. Later that evening, the Petitioner went to the sheriff's office with his mother and an attorney, and he was arrested.

A medical examiner testified at the Petitioner's trial that seven gunshot wound paths were in the victim's body. Thirteen shell casings were recovered from the scene. The jury found the Petitioner guilty of first degree premeditated murder.

In the Petitioner's appeal of the conviction, this court determined that (1) the trial court's comment to prospective jurors about first degree murder penalties was harmless error, (2) the court did not abuse its discretion in denying the Petitioner's motion for a mistrial when Mr. Clark testified that the Petitioner had been in trouble previously and that he did not

think it was "the best of ideas" for the Petitioner to carry a gun, (3) the court did not err in allowing a police officer to offer lay witness testimony about marks he found on the curb at the scene being consistent with bullet ricochet marks, (4) the court did not abuse its discretion in admitting autopsy photographs, (5) the court did not err in instructing the jury on flight, (6) the evidence was sufficient to support the conviction, (7) the court did not err in denying the request for a self-defense instruction, and (8) no cumulative error existed. *See State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827 (Tenn. Crim. App. Aug. 12, 2011), *perm. app. denied* (Tenn. Dec. 14, 2011).

## Post-Conviction Proceedings

The Petitioner retained an attorney to file a post-conviction petition, but the attorney failed to file the petition within the statute of limitations. A second attorney filed an untimely petition and a motion requesting that the post-conviction court toll the statute of limitations due to the first attorney's error, and the court granted the motion.

At the post-conviction hearing, the evidence showed that the Petitioner's mother contacted counsel[1] on the night of the crime. Counsel was present when the Petitioner surrendered to the authorities, and the Petitioner's mother retained counsel to represent the Petitioner. Within a short period of time, she also retained co-counsel. Both counsel and co-counsel testified that they never discussed who would be lead counsel and that they divided the duties, with counsel obtaining technical support to retrieve text messages from a cell phone and co-counsel hiring a private investigator and a mental health expert. Counsel and a third attorney represented the Petitioner in the appeal, with the third attorney taking primary responsibility for preparing the brief.

Regarding the day of the crime, the post-conviction evidence showed that the Petitioner worked until mid-afternoon for his stepfather, John Michael McKinnon. After work, the Petitioner, Mr. McKinnon, and a co-worker drank two twelve-packs of beer on their way to Mr. McKinnon's house, where they continued drinking. At some point, the Petitioner went to the apartment he shared with Ms. Holmes. When asked about the Petitioner's sobriety when he left, Mr. McKinnon testified that the Petitioner seemed "fine."

Roger Williamson, the Petitioner's father, testified about an incident before the crime in which the victim followed the Petitioner home and "cut a tailspin" in the driveway. He encouraged the Petitioner to file a complaint with the sheriff's department. He said that

---

[1] We have identified the Petitioner's trial attorneys as "counsel" and "co-counsel" for purposes of distinguishing between them. The evidence showed that neither attorney assumed the role of lead counsel. No leadership or secondary role should be inferred from the designations we have used.

while they waited for the sheriff's department to arrive, the Petitioner let him listen to recordings on the Petitioner's cell phone of "threats and stuff" from the victim. He said he was concerned for the Petitioner's safety.

Mr. Williamson testified that he paid part of the attorney's fees for the trial and that he paid the fees for the appeal. He said co-counsel asked him shortly before the trial to pay the fees for a mental health expert, and he agreed. He said he asked counsel immediately after the crime if the Petitioner should see a doctor. He said that he would have paid for additional investigation or experts if he had been asked and that he was paying for the post-conviction case. He said counsel and co-counsel never talked to him about the Petitioner's childhood or any issues the Petitioner might have had. He said he would have testified if he had been asked.

John Michael McKinnon testified that he was living with the Petitioner's mother, Maria Creasy, at the time of the crime. He said that neither counsel, co-counsel, nor their representatives contacted him about the Petitioner's actions on the day of the crime. He said they never asked if the Petitioner had been drinking that day or inquired about the Petitioner's relationship with Ms. Holmes before that day. He said he would have talked to them if they had asked for information.

Maria Creasy, the Petitioner's mother, testified that before the crime, the Petitioner confided in her about his relationship with Ms. Holmes. She said the couple's problems escalated in May and June 2008. She was aware of the problems the Petitioner had with the victim. She said the Petitioner was fearful and frustrated because he did not understand what to do. She said the Petitioner typically carried a gun.

Ms. Creasy testified that the Petitioner started a new job on June 16, 2008, and that she was unable to reach him on June 17, which she understood was because he was in bed due to Ms. Holmes's "bickering at him all day." She said that on the morning of June 18, the Petitioner came to her house and said he wanted to work with Mr. McKinnon and that Mr. McKinnon agreed.

Ms. Creasy testified that the Petitioner, Mr. McKinnon, and another man came to the house after work. She said everyone was drinking. She said that Ms. Holmes kept calling and that the Petitioner was reluctant to leave but eventually went home. She said that after she learned of the shooting, she contacted the Petitioner. She also contacted counsel, who met her and the Petitioner at the sheriff's department. She said she hired both counsel and co-counsel to represent the Petitioner.

Ms. Creasy testified that co-counsel initially stated that his attorney's fee would be $25,000, which she paid. She said she requested an invoice and received one dated July 2, 2008 that stated the amount did not include investigative fees or third-party expenses. She said co-counsel kept requesting more money, and she kept paying him. She said she paid him $15,000 on September 26 and $10,000 on October 22. She assumed co-counsel was paying the investigators from the $50,000 she had paid at this point. She said she received a December 3 invoice that stated she had paid a flat fee of $30,000. She paid an additional $5,000 on February 13, 2009, after co-counsel told her she still owed him. She said he stated she would be charged a fee if she did not pay the balance. She said she had to ask repeatedly to receive invoices reflecting her payments and was never given a retainer letter. She provided documentation of her payments, which were received as exhibits. She said that she was unable to get a clear answer about the money she paid co-counsel and that he was difficult to reach.

Ms. Creasy testified that co-counsel told her a civil case he filed against the victim's estate was part of his strategy for handling the criminal case and that he did not expect to prevail in the civil case. She said that he never told her there would be additional attorney's fees and expenses for the civil case and that he never asked for attorney's fees for a civil case the victim's estate filed against the Petitioner.

A private investigator testified that he had no difficulty obtaining Brandon Clark's personnel records from the Sumner County Sheriff's Department. The records, which related to off-duty conduct, were received as an exhibit.

Co-counsel testified that he charged the Petitioner's mother a $50,000 flat fee to represent the Petitioner. He did not remember the fee for the civil case. He did not know how the expenses for the investigator and the expert were billed.

Co-counsel testified that he filed a civil complaint alleging intentional infliction of emotional distress and assault on the Petitioner's behalf against the victim's estate. He said he filed the civil complaint to be "consistent" with the defense in the criminal case, but he denied the sole purpose of the civil litigation was to take depositions. He acknowledged the civil case provided more opportunity for discovery than the criminal case. He thought some of the depositions were taken but said he did not have any transcripts. He said that the deponents were the victim's neighbors and that he was interested in knowing whether the victim had a weapon. He said the deponents provided additional names of witnesses that were given to Chrystal Waltz, the private investigator. He acknowledged the date reflected in the deposition notices, which was about one month before the criminal trial.

Co-counsel testified that the victim's estate filed a lawsuit against the Petitioner and that he did not know if the second civil suit would have been filed if he had not filed the first one. He acknowledged that in the case filed by the estate, sanctions were requested for his and the Petitioner's failure to appear at a deposition.

Co-counsel testified that he worked with the investigator to obtain information and statements. He said he did a substantial amount of legal research on possible defenses and the effect of the victim's continuing threats. He said that he communicated consistently with counsel and that as the trial date approached, they spent more time on the case because an attorney must dedicate his or her entire practice to a case about to be tried. He acknowledged that cell phone records were subpoenaed on the Friday before the trial started the following Monday.

Co-counsel testified that the defense wanted to show that due to ongoing pressure and conflict with the victim, the Petitioner reacted because he perceived a real and present threat. He said they wanted to show that when the Petitioner arrived at the victim's home, he felt compelled to defend himself. He said that he and counsel did not obtain a mental health expert initially because they concluded from their own observation of the Petitioner and analysis of the case that diminished capacity was not an appropriate defense.

Regarding the decision to consult a mental health expert shortly before the trial, co-counsel testified that he hired Dr. Stephen Montgomery to evaluate the Petitioner. He did not recall what documents he provided Dr. Montgomery and said he spoke to him before and after the evaluation for more than five minutes. He did not recall Dr. Montgomery's diagnosis of the Petitioner but said the doctor's testimony would not have supported a diminished capacity defense. He said he and counsel filed a notice of intent to offer expert mental health testimony and thought the trial court ruled that it was untimely. Exhibits were received reflecting defense filings about a week before the trial began relative to mental health evidence. He thought the possibility of expert proof was not mentioned at the June 29 pretrial conference because the evaluation was scheduled for the following day. He said the delay in obtaining the evaluation was due to continually evolving trial strategy. He said that he thought calling a mental health expert would have been a risk and that successful cross-examination of a defense expert could show that the Petitioner was not "feeling as bad" as the defense tried to portray and could "gut" the defense. He did not think it was a "body blow" to the defense that Dr. Montgomery did not testify.

Co-counsel testified that to the best of his recollection, the discovery information indicated the Petitioner was angry and drinking before he left his apartment. He said that Mr. McKinnon was interviewed and that he was sure Mr. McKinnon was asked if Mr. McKinnon and the Petitioner drank after work. He said he and counsel never had any indication the

Petitioner had been intoxicated. He said that he cross-examined Ms. Holmes about a text message stating that the Petitioner was intoxicated on the night of the crime and that she professed no recollection of having sent the message. He agreed that Brandon Clark and the Petitioner were friends and that Mr. Clark did not want to testify against the Petitioner. He said that after interviewing the Petitioner, he did not think alcohol use or intoxication were issues and noted that the Petitioner was physically fit and "worked out" a lot.

Co-counsel testified that he met with post-conviction counsel and a private investigator but acknowledged he had not returned several telephone calls from post-conviction counsel. He recalled post-conviction counsel's providing a release signed by the Petitioner for co-counsel's file from the conviction proceedings, but he did not recall whether he ever provided it. He said that he had looked for it and that the file could have been lost in a move.

Counsel testified that he was retained first and that he was surprised when the Petitioner's family hired co-counsel shortly thereafter. He said he had the impression initially that they considered co-counsel to be lead counsel, although he thought their expectation changed over time. He said he hired a technical person to access the information from the Petitioner's cell phone, but he did not recall the person's attempting to record the Petitioner's voice messages. He said he relied on co-counsel to direct the private investigator's work, and he thought he talked to the investigator at some point. He said co-counsel handled the contact with the mental health expert and acknowledged that they should have involved a mental health expert sooner, although he said he did not know if it would have made a difference. Counsel said that in hindsight, he was the more experienced attorney and should have taken the responsibility to obtain an expert earlier. He said no reason existed for the delay in consulting an expert. Regarding a notice of intent to use a mental health expert he filed on July 9, 2009, he stated that he filed it as soon as he knew the defense might offer expert testimony. He acknowledged that the State objected to the notice and that the defense withdrew it on the first day of the trial. He said co-counsel told him Dr. Montgomery was not going to say anything helpful for the defense. He said he met with co-counsel at co-counsel's office a couple of times and at the courthouse. He did not recall co-counsel's coming to counsel's office but said co-counsel might have.

Counsel testified that he visited the Petitioner at the jail several times. He did not know how many times but said it might have been as many as twelve. He tried to obtain information from the Petitioner, and closer to the trial, he reviewed the Petitioner's potential testimony with him. He did not recall if the Petitioner wrote to him expressing concern about being ready for trial.

-7-

Counsel testified that Brandon Clark was an important witness because Mr. Clark said in a written statement that the Petitioner had stated the shooting was premeditated. He thought in retrospect that the defense should have obtained Mr. Clark's personnel records.

Counsel testified that the defense theory was that the Petitioner went to the victim's house to confront but not to kill him, but that when he saw others were present, the Petitioner panicked and fired the gun. The defense wanted to show that friction and stress existed between the Petitioner and the victim and that Ms. Holmes "stirred it up." Counsel acknowledged that the defense knew from the discovery information that Ms. Holmes said the Petitioner was intoxicated when he left their apartment and that they did not do much investigation of the Petitioner's alcohol use on the day of the crime. He said, though, he did not notice signs of intoxication when he met the Petitioner at the sheriff's department on the night of the crime. He said that although he and co-counsel might have pressed the Petitioner more about an accurate account of his alcohol consumption on the night of the crime, basing a defense upon intoxication was difficult.

Counsel testified that he and co-counsel were familiar with the facts before the trial began. He said that they had investigative work done and that he talked to some of the witnesses. He said he sought and obtained a second preliminary hearing about a week before the trial after they discovered no recording of the first one existed. He said that at the time, he felt like he had everything he needed for the trial and that he did not have any "major surprises" at the trial.

Counsel testified that he orally requested a self-defense instruction at the trial but did not submit a written request. He said the trial court's practice was to instruct the jury on everything fairly raised by the evidence. The post-conviction court noted that the self-defense instruction issue had been raised in the appeal of the conviction.

Chrystal Waltz testified that she performed investigative services for the defense while employed with Inquisitor. She said that co-counsel controlled the scope of the investigation and that she never discussed the investigation with counsel. She interviewed the Petitioner once at the jail but was unable to have a private interview because she was not an attorney. She said they met in the visitation room. She told co-counsel she was unable to have a private visit but did not recall if she asked him to accompany her in order to facilitate a private visit. She said that generally, one interview was insufficient to have a full understanding of the client and the situation. She said she was unable to get as much information as she wanted from the Petitioner because their meeting was not private. She said the Petitioner mentioned drinking two or three beers on the night of the crime but did not mention an alcohol problem.

Ms. Waltz testified that after she took photographs and prepared memoranda, she did not continue the investigation because she was unable to contact co-counsel. The memoranda were received as exhibits and listed various dates in June 2008. Based upon Ms. Waltz's experience, she thought further investigation was warranted. She said she was not asked to gather information about the Petitioner's mental health, education, or any hospital records. She said obtaining personnel and disciplinary records of testifying law enforcement officers was fairly routine.

Dr. Stephen Montgomery, a forensic psychiatric expert, testified that he evaluated the Petitioner in 2009. He said he did not prepare a report at that time but kept his notes. He said that he subsequently received additional information from post-conviction counsel about the Petitioner's social background, family, alcohol usage, threats from the victim, and details of the incident and that he prepared his report after receiving the additional information.

Dr. Montgomery testified that in his opinion, the Petitioner had post-traumatic stress disorder (PTSD) caused by the victim's ongoing threatening behavior, as well as substance use disorders involving alcohol, cannabis, and cocaine. He said he did not initially diagnose PTSD but reached the diagnosis after receiving the additional information. He noted the Petitioner's young age and stated that at the time of the crime, the then-twenty-four-year-old Petitioner's brain would not have been fully developed. He said the brain was fully developed around age twenty-six or later in males.

Dr. Montgomery acknowledged receiving information from post-conviction counsel that the Petitioner had more alcohol on the day of the crime than the one or two beers the Petitioner originally reported. He said that alcohol impaired judgment and impulse control, without regard to whether a person had PTSD, but that a person with both a substance use disorder and a mental disorder typically experienced a synergistic effect. He said people with PTSD commonly self-medicated to lessen the intensity of their emotions. He said that trauma had a cumulative effect and that in his opinion, the Petitioner's PTSD and alcohol consumption would have significantly impaired his ability to exercise reflection and judgment. In Dr. Montgomery's opinion, it was more likely than not that the Petitioner lacked the capacity to form the culpable mental state for the offense, but he was unable to state that this was his opinion to a reasonable degree of medical certainty. When asked by the post-conviction court if the Petitioner had a mental disease or defect, rather than a particular emotional state or mental condition, Dr. Montgomery affirmed that the Petitioner had a mental disease or defect.

Regarding his communication with the Petitioner's trial attorneys, Dr. Montgomery said he had two telephone conversations of less than six minutes' duration each. He said the only information he had when he met with the Petitioner had been from a brief telephone call

from an attorney but did not recall what the attorney told him. He did not recall exactly what he said to the attorney after he interviewed the Petitioner, but he thought he said evidence of a mental disorder that might be relevant to diminished capacity existed. He said he was not comfortable stating that the Petitioner lacked the capacity to exercise reflection and judgment but that it was possible the Petitioner lacked this capacity.

Dr. Montgomery acknowledged that the Petitioner had been in jail for several months when they met. When asked if the Petitioner's PTSD was the result of the Petitioner's knowledge that he had killed a former friend, his arrest, and his incarceration, Dr. Montgomery said, "[A]nything is possible." He said the information he received from the Petitioner was inconsistent with PTSD resulting from those causes. He said it was difficult for a psychiatrist to say with certainty that a person was unable to form the intent for first degree murder committed a year earlier. He said PTSD symptoms might include irritability, anger, impulsiveness, and an inability to stop, reflect, and reason. He said PTSD "very well could have" caused the Petitioner to have misconceptions about what was taking place on the night of the crime.

Dr. Montgomery's report, which was received as an exhibit, noted that the Petitioner stated in the psychiatric evaluation that he was on edge all the time due to the victim's harassment. The Petitioner told Dr. Montgomery that he scanned cars and parking lots, had dreams of being killed by the victim, had intrusive daytime thoughts about the victim, and avoided the victim's house. The Petitioner also stated that he was hesitant to go places he might see the victim, avoided mutual friends, checked from a distance for signs of the victim when approaching his apartment, was irritable, had some emotional numbness, and experienced decreased attachment to his girlfriend.

Dr. Montgomery's report noted that in October 2007, the Petitioner saw the victim at a bank and that the victim communicated to the Petitioner through Ms. Holmes that he had been there to kill the Petitioner. The Petitioner told Dr. Montgomery that in October or November 2007, the victim, while driving a large truck, tried to run him off the road and had followed him home and driven "donuts" in the driveway. The Petitioner told the doctor that the victim yelled and screamed at him when the Petitioner and Ms. Holmes were at the victim's house to pick up the child. The Petitioner recounted an incident in which the victim beat on the Petitioner's car windows and threatened to kill him, which was similar to a childhood incident in which the Petitioner's father beat on the Petitioner's mother's car windows when his mother decided to leave home with the Petitioner and another child.

Pertinent to his conclusions, Dr. Montgomery stated the following in his report:

Mr. Williamson described developing a constellation of psychiatric symptoms consistent with the symptoms of posttraumatic stress disorder (PTSD) as a result of the threatening statements and behaviors of the victim. Mr. Williamson was not being treated for PTSD at the time of the incident. Persons who develop PTSD experience disruptions in the way their brains and bodies manage stress. Their "fight or flight" responses become overly sensitive and trigger excessive reactions to innocuous stimuli.

A growing body of research indicates that persons with PTSD have disruptions in parts of their brains that are responsible for inhibiting fear responses and exercising appropriate judgment and impulse control particularly during emotionally intense situations. The type of relationship that Mr. Williamson described that existed between he, the victim, and the girlfriend was one of chronic . . . stress and one that evoked intense emotions in all involved parties.

It is possible that due to Mr. Williamson's untreated PTSD condition and the intensity of the emotional circumstances, . . . Mr. Williamson misperceived environmental signs of danger and reacted in an impulsive protective manner. In such a state it is possible that he lacked the capacity to exercise reflection and judgment prior to shooting the victim. The degree to which Mr. Williamson was under the influence of alcohol at the time may have also impaired his ability to reflect and exercise judgment prior to acting.

The Petitioner testified that he met with counsel six to eight times before the trial but acknowledged they may have met as many as twelve times. He said that not all of their meetings were private and that most were short and pertained to the day's court proceedings. He said one or two of the meetings were lengthy and involved questions and answers. He said they never discussed his background, life, or things not necessarily related to the case. Their conversations about the day of the crime pertained mainly to the events at his apartment until he turned himself in. He said counsel did not seem concerned with earlier events of the day. He acknowledged, though, that he testified about the victim's prior threats, an incident in which the victim tried to run him off the road, meeting the victim at the bank and the victim's pounding on a car, a telephone call with the victim on the Monday before the crime, and his joining a different gym to avoid the victim. He said he and counsel never discussed his alcohol consumption other than the two and one-half beers he drank on the night of the crime. He said he did not understand its relevance and would have given counsel more information if he had been asked. He said that at the time of the trial, he thought counsel knew the facts of the case.

-11-

The Petitioner testified that he met with co-counsel two or three times before the trial. He said the first meeting was at the jail via video conference and was an introductory meeting. He said co-counsel stated that the facts presented a clear case of self-defense and that the Petitioner was looking at nothing worse than "involuntary manslaughter." He said the second meeting was "through the glass" around Christmas and was a "general hello visit." He thought he did not meet again with co-counsel until during the two-week period before the trial. The meeting was the first time in which co-counsel asked the Petitioner about the relevant events surrounding the incident. The Petitioner said co-counsel never asked about his drinking habits, his background and social history, and what he did before he went to his apartment on the night of the crime.

The Petitioner testified that he was unable to speak freely with Ms. Waltz because their meeting was not private. He said that he was truthful when he told her he had two or three beers at home and that he misunderstood the time period about which he was asked. He said he never discussed with Ms. Waltz or counsel that he had been drinking all afternoon.

The Petitioner acknowledged that he received discovery documents fairly early in the case. He said a member of co-counsel's staff instructed him how to send legal mail from the jail and explained how to provide co-counsel with his notes from the discovery. He thought he provided his discovery notes to counsel on a court date and said he gave counsel more notes on the day the trial began. Of concern to him in the discovery was Mr. Clark's statement about premeditation. He thought Mr. Clark overstated what the Petitioner actually said. He acknowledged that he and Mr. Clark were good friends and that he told Mr. Clark he shot the victim.

The Petitioner testified that a long period of time passed without any court proceedings or hearing from the attorneys, and he wrote to them because he was concerned he had not heard anything. He said they wrote back stating that things were going as planned.

The Petitioner testified that before he turned himself in on the night of the crime, he left his cell phone with his mother for her to give to counsel. He understood that counsel was going to save his voice messages to a CD in order for the messages to be played at the trial. He said he learned right before he testified that it was not possible. He said that counsel asked him to unlock the phone in order for the messages to be played from the phone but that the messages were not saved on the phone because the service had lapsed. He thought a message existed about stopping to bid on a job after he left where he worked all day on the day of the crime. He identified documents containing printouts of text messages that had been stored on his cell phone. Post-conviction counsel stated that some of the messages were

not introduced at the trial. The Petitioner noted that one of the messages that was not introduced at the trial was from him to Ms. Holmes about his stopping to bid on a job after work. He said he, Mr. McKinnon, and their co-worker shared a twelve-pack of beer between the job site and the bid location and shared a second twelve-pack on the way from the bid location to Ms. Creasy and Mr. McKinnon's house, where they continued drinking.

The Petitioner thought he found out about the mental health evaluation the day before it was to take place. He said he was told his lawyer would talk to him the next day, although he did not specify which attorney was to speak to him. He said that he was told the attorneys wanted him to talk to Dr. Montgomery to see what the doctor would say but that he was not told what to expect or what he might be asked.

Regarding the civil case against the victim's estate, the Petitioner testified that co-counsel told him it would allow them to take depositions, to have subpoena power, and to know if the witnesses would say something different in deposition testimony than in their police statements. He said that co-counsel never led him to believe the civil case had a purpose other than to obtain discovery for the criminal case and that co-counsel told him at some point that the civil case had been dropped. He said the attorneys made the civil case sound like something that was a typical defense attorney tactic. He said he never discussed the fees for the civil case with counsel or co-counsel.

After receiving the proof, the post-conviction court denied relief. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

The Petitioner contends that he was denied the effective assistance of counsel. To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The

-13-

Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

**I**
**Failure to Investigate, Develop, and Present Evidence to Challenge Mens Rea**

In several related issues, the Petitioner contends that his trial attorneys provided ineffective assistance by failing to investigate and develop evidence to challenge the State's proof of the culpable mental state required for first degree murder and by failing to offer the evidence at the trial. The Petitioner's allegations relate to the failure to obtain a prompt psychiatric evaluation and to offer testimony of a mental health expert at the trial. He also contends that the post-conviction court erred in ruling that Dr. Montgomery's testimony would have been inadmissible if the defense had attempted to present it at the trial. The State contends that because the trial court did not err in ruling that Dr. Montgomery's testimony was inadmissible, the Petitioner cannot establish the prejudice prong of an ineffective assistance of counsel claim.

**A. Deficient Performance**

We begin with consideration of whether counsel and co-counsel performed deficiently. The record reflects that both trial attorneys met with the Petitioner and that the Petitioner's parents and Mr. McKinnon maintained some level of communication with the attorneys, particularly co-counsel. Ms. Waltz met with the Petitioner shortly after the crime at co-counsel's direction, and her report reflects that the Petitioner recounted the victim's history of harassment and aggression toward the Petitioner.

Counsel testified that he and co-counsel divided the trial preparation duties and that co-counsel was responsible for consulting and retaining a mental health expert, but he acknowledged that in hindsight, they should have involved a mental health expert earlier in the case and said no reason existed for the delay. Both counsel and co-counsel testified that the defense was based upon the Petitioner's reaction to the victim's ongoing harassment. Nevertheless, the effort to obtain expert assistance came about only shortly before the July 13, 2009 trial, and the expert was provided with minimal information. The attorneys did not mention the possibility of a mental health expert at the June 29, 2009 pretrial conference, and the evaluation had not yet taken place. Dr. Montgomery testified that according to his records, he and one of the Petitioner's attorneys had two brief conversations, each of which was less than six minutes in duration. His invoice, which was received as an exhibit, shows charges for telephone conversations of 0.10 hour each with co-counsel on July 1 and 6, 2009. It also reflects charges for travel to and from the jail and a meeting with the Petitioner on June 30, 2009.

The post-conviction exhibits show that the Petitioner's trial attorneys filed a series of notices of intent to offer expert proof on July 6 and 7, 2009, and that the State filed a response alleging that the notices were "faulty as to notice given to the State," that they were "inadequate as to the particularity" of the nature of Dr. Montgomery's testimony, that the testimony was irrelevant, and that the State had not received an expert report. Hours after the State filed its response, co-counsel filed an amended notice stating that Dr. Montgomery's testimony related to the Petitioner's mental state, which included PTSD resulting from the victim's constant threats. The State filed an amended notice to exclude the expert testimony which noted the untimeliness of the defense motion and contended that no good cause existed to allow late filing of the motion. The defense withdrew the notice on the first day of the trial, and Dr. Montgomery did not testify.

The post-conviction court found that the Petitioner's trial attorneys did not perform deficiently in choosing not to offer Dr. Montgomery's testimony. The court did not specifically address, however, the failure to obtain a timely mental health evaluation. Upon review, we conclude that in light of the facts of the case and the chosen defense theory, the failure to consult a mental health expert and to obtain an evaluation of the Petitioner in a timely manner was deficient performance. The facts available to the Petitioner's attorneys

at the time warranted prompt consultation with a mental health expert regarding mens rea and PTSD.

Regarding the Petitioner's allegation that the trial attorneys failed to investigate the Petitioner's alcohol use as a component of a mental health defense, the post-conviction court found that no proof showed the Petitioner was "under the influence to any extent that affected his ability . . . to premeditate." The Petitioner's account to his attorneys, Ms. Waltz, and Dr. Montgomery of the amount of alcohol he consumed on the night of the crime, his account of his customary alcohol consumption, and counsel's personal observations of the Petitioner on the night of the crime do not support a finding of deficient performance in the investigation of or consultation with an expert regarding the Petitioner's alcohol use for the purpose of supporting a mental health defense. *See Strickland*, 466 U.S. at 691 (stating that the reasonableness of counsel's actions should be evaluated in light of information provided by a defendant to counsel).

## B. **Prejudice**

Because we have found deficient performance by counsel and co-counsel, the question becomes whether the Petitioner was prejudiced by their failure to obtain a prompt mental health evaluation. The post-conviction court found that the Petitioner failed to prove by clear and convincing evidence that he was prejudiced because Dr. Montgomery's testimony did not meet the standards for admissibility and would not have been admitted at the trial.

In a criminal prosecution, the State has the burden of proving beyond a reasonable doubt that a defendant possessed the required mens rea. *See* T.C.A. § 39-11-201(a)(2) (2014) In this case, the State was required to prove that the Petitioner committed an unlawful, premeditated, and intentional killing of the victim. *See* T.C.A. §§ 39-13-201 (2014), 39-13-202 (2014). In order to rebut the State's proof of mens rea, "evidence of a defendant's mental condition can be relevant and admissible in certain cases[.]" *State v. Abrams*, 935 S.W.2d 399, 402 (Tenn. 1996); *see also State v. Phipps*, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). Tennessee recognizes the right of a defendant to present expert proof to negate the existence of the culpable mental state required for the offense. *State v. Hall*, 958 S.W.2d 679, 679-80 (Tenn. 1997); *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009); *see* T.C.A. § 39-11-203(e)(1) (2014) (recognizing as a ground of defense the negation of an element of an offense). The so-called rule of diminished capacity "'[p]roperly understood . . . is not a defense at all but merely a rule of evidence.'" *Hall*, 958 S.W.2d at 688-89 (quoting *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987)); *see also State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013).

## 1. **Admission Pursuant to the Tennessee Rules of Evidence and *State v. Hall***

"When . . . a defendant seeks to utilize expert testimony to negate an element of the offense, trial courts must consider the evidentiary principles pertaining to relevancy and expert testimony as set forth in the Tennessee Rules of Evidence." *Ferrell*, 277 S.W.3d at 380 (citing *Hall*, 958 S.W.2d at 689). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Regarding the admissibility of expert testimony, Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 provides,

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence[.]

Whether to admit expert testimony is within the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). A trial court's ruling will be reversed only if the lower court abused its discretion, which requires a showing that the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

In the present case, the post-conviction court found that Dr. Montgomery was a qualified expert witness but that his testimony would not have been admissible at the trial because it did not meet the relevance and reliability requirements of the Rules of Evidence and the *Hall* threshold for diminished capacity to form the requisite mental state evidence. The court noted that although Dr. Montgomery diagnosed the Petitioner with PTSD related to the victim's ongoing harassment and threats, the doctor could only state that it was possible the Petitioner's untreated PTSD and the intense emotional circumstances caused the Petitioner to misunderstand the situation and that it was possible the Petitioner lacked the capacity to exercise reflection and judgment before shooting the victim. The court noted, as

well, that Dr. Montgomery could only state that it was possible the Petitioner's ability to reflect and exercise judgment was affected by alcohol impairment.

Dr. Montgomery's testimony and report reflect his opinion that the Petitioner suffered from PTSD and that the Petitioner's PTSD and alcohol consumption significantly impaired the Petitioner's ability to exercise reflection and judgment. Dr. Montgomery testified, though, that he thought it was possible the Petitioner lacked the capacity to exercise reflection and judgment due to the PTSD and alcohol consumption, but he was unwilling state that it was his expert opinion that the Petitioner lacked the capacity to do so.

In *State v. Hall*, our supreme court concluded "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." 958 S.W.2d at 689. The *Hall* court provided the following admonition:

> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of a lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

*Id.* at 690 (citing *State v. Shelton*, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992)). When presented on subsequent occasions with questions involving the admissibility of expert proof, the supreme court has adhered to the parameters of *Hall*. *See, e.g.*, *Ferrell*, 277 S.W.3d at 378-79; *State v. Faulkner*, 154 S.W.3d 48, 56-57 (Tenn. 2005).

Our supreme court's decision in *State v. Hatcher*, 310 S.W.3d 788 (Tenn. 2010), is instructive. In *Hatcher*, the juvenile defendant participated with his older brother and another co-defendant in the shootings of three victims.

> The defense theory . . . was that he was so frightened of his brother Chris that he participated in the shootings with less than the culpable mental state required for premeditated murder or attempted premeditated murder. That is, the defense argued that [the defendant's fear of his brother] prevented him from acting intentionally and with premeditation while he participated in the shooting.

*Hatcher*, 310 S.W.3d at 808. The defense relied upon the defendant's testimony to support its theory and did not offer expert proof. The defense sought a special jury instruction to

support its theory that the defendant's fear of his brother negated the culpable mental state. In determining whether the trial court properly denied the request, the supreme court looked to *Hall* for guidance. The *Hatcher* court noted that the defense theory relied upon "a particular emotional state or mental condition" but not a "lack of capacity to form the requisite mental intent." *Id.* at 805-07 (quoting *Hall*, 958 S.W.2d at 690). For this reason, the court concluded, the trial court properly denied the requested instruction. *Id.* at 807. Although *Hatcher* involved a jury instruction question, it nevertheless provides guidance regarding the principles of *Hall*.

This court recently faced a situation similar to the Petitioner's in *State v. Tray Dontacc Chaney*, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655 (Tenn. Crim. App. May 14, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014). In that case, the State appealed the trial court's denial of its motion in limine to exclude the testimony of a defense psychologist who would testify that the defendant's borderline intellectual capacity combined with related situational factors "eroded" the defendant's capacity to premeditate. The State sought exclusion of the evidence because the expert could not testify unequivocally that the defendant was unable to form the required mens rea. This court examined *Hall*, *Faulkner*, *Ferrell*, and unreported Court of Criminal Appeals cases and concluded that the evidence was irrelevant and inadmissible and that the trial court abused its discretion in denying the State's motion in limine to exclude the evidence. In so holding, this court reasoned:

> [T]he case law holds that expert testimony regarding a defendant's mental state is relevant and admissible only to establish that, at the time of the crimes, the defendant lacked the capacity to premeditate. Since Dr. Kennon's testimony did not do so, we conclude that the trial court erred in finding that the testimony was admissible.

*Tray Dontacc Chaney*, 2014 WL 2016655, at *9; *see State v. Herbert Michael Merritt*, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at *27 (Tenn. Crim. App. Mar. 22, 2013) (holding that the trial court did not abuse its discretion in excluding evidence that the defendant's mental disease or defect impaired or reduced his ability to form the required mens rea, rather than stating that the defendant "completely lacked the capacity to commit premeditated first degree murder"), *perm. app. denied* (Tenn. Aug. 13, 2013); *State v. Robert Austin*, No. W2005-01963-CCA-R3-CD, 2007 WL 2624399, at *6 (Tenn. Crim. App. Sept. 10, 2007) (holding that although the trial court erred in ruling that an expert witness could not testify about the ultimate issue of the defendant's mental state, the error was harmless because testimony that the defendant's mental disease merely "impacted" his capacity to form the required mental state was inadmissible under *Hall*); *State v. Antonio D. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207, at *4 (Tenn. Crim. App. Nov. 1, 2006) ("The fact that the [defendant's] mental disease impaired or reduced his capacity to

form the requisite mental state does not satisfy the two-prong requirement in *Hall* and *Faulkner*."), *perm. app. denied* (Tenn. Feb. 26, 2007).

The Petitioner argues in his reply brief that other post-*Hall* cases, including *Ferrell*, do not support a narrow construction of *Hall*. We disagree. We note that *Ferrell* stands for the proposition that evidence to negate the mens rea is not limited to expert psychiatric testimony. 277 S.W.3d at 377-81. The Petitioner also argues that *Hatcher* stands for the proposition that *Hall* should not be rigidly applied. He notes that *Hatcher* quoted the pattern jury instruction for evidence of mental state and contends that the instruction contains language that indicates the evidence regarding mental state should be admitted even if it is stated in less than certain terms. We disagree with his reading of *Hatcher* and the pattern instruction. The pattern jury instruction informs the jury of the matters it must resolve as the trier of fact, whereas the admissibility of expert proof is determined by the trial judge and governed by the Rules of Evidence and *Hall*. The proffered evidence still must show that a defendant suffered from a mental disease or defect, not just a particular emotional state or mental condition. To the extent that the Petitioner seeks to utilize the pattern instruction as a guide to the admissibility of evidence by a trial court, rather than evaluation of evidence that has been properly admitted by the jury, his argument is misplaced. *See Hatcher*, 310 S.W.3d at 804-07; T.P.I.–Crim. 42.22 (18th ed. 2014) (evidence of mental state).

We have also rejected the Petitioner's argument that the proposed evidence in *State v. Vaughn*, 279 S.W.3d 584 (Tenn. Crim. App. 2008), was stated with no greater certainty than were the opinions expressed by Dr. Montgomery in the present case. As relevant here, *Vaughn* involved the denial of a defense motion for a continuance and denial of funds for expert assistance. In support of the motion, an expert had submitted an affidavit stating that the defendant's voluntary intoxication "may have rendered him unable to form the requisite mens rea for the alleged actions in accordance with the criteria listed *State v. Hall* and T.C.A. 39-11-503." *Id.* at 597, n.9. In concluding that the trial court erred in revoking the funds for expert assistance, the court said expert testimony on the issue of voluntary intoxication was relevant and admissible pursuant to *Hall*, but the court did not state that the proposed expert's opinion, as stated in the affidavit, would be admissible evidence at a trial. *Id.* at 597-602.

We have considered the other cases upon which the Petitioner relies. *See Adams*, 405 S.W.3d 641; *Mobley v. State*, 397 S.W.3d 70 (Tenn. 2013); *Shuck*, 953 S.W.2d 662; *State v. Don Sanders*, W2006-02592-CCA-R3-CD, 2008 WL 1850934 (Tenn. Crim. App. Apr. 22, 2008); *State v. Maurice Lamont Davidson*, No. M2002-00178-CCA-R3-CD, 2003 WL 151202 (Tenn. Crim. App. Jan. 22, 2003), *perm. app. denied* (Tenn. May 19, 2003). These cases do not support the Petitioner's argument that equivocal expert testimony is permitted.

Based upon our review of the law, we conclude that the post-conviction court did not err in determining that Dr. Montgomery's testimony would have been inadmissible pursuant to the Rules of Evidence and *Hall*. Dr. Montgomery stated only that it was a possibility that due to a mental disease or defect, the Petitioner lacked the capacity to form the required mens rea. Although Dr. Montgomery was able to state an opinion with certainty regarding the Petitioner's PTSD and substance use disorder diagnoses, evidence of these diagnoses was not relevant and admissible without an opinion regarding the ultimate issue of the Petitioner's capacity to form the required mens rea.

**2.      Admission Pursuant to the Right to Present a Defense**

The post-conviction court also considered the Petitioner's contention that notwithstanding the Rules of Evidence, due process required admission of the expert proof because its exclusion deprived him of the opportunity to present a defense. *See State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) ("The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense."). In determining whether due process requires admission of evidence, notwithstanding the Rules of Evidence, our supreme court has said,

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. *See Chambers*, 410 U.S. at 298-301, 93 S. Ct. at 1047-49.

*Brown*, 29 S.W.3d at 433-34.

The post-conviction court conducted an analysis of the *Brown* factors and concluded that the Petitioner was not deprived of the opportunity to present a defense by the exclusion of the evidence. The court noted that the Petitioner testified and was able to present a defense despite the exclusion. It likewise observed that the evidence did not bear indicia of reliability because it showed that the Petitioner was under stress and had strong emotions from the conflict with the victim but not that he was incapable of committing first degree murder. The court noted the trial evidence that the Petitioner said, "You just got him killed," before leaving his house, that he took a loaded gun to the victim's house to create a conflict, that he drove thirteen miles over the course of twenty minutes to get there, that the victim put

up his hands and said, "What's up?" before the Petitioner shot him, that the Petitioner fired thirteen shots with some striking the victim's back, that the Petitioner left the scene with the victim dying in the street, and that he disposed of the gun. The court also found that the evidence "doesn't even begin to approach" reliability. Regarding the importance of the interest supporting exclusion, the court noted that the right to present a defense would not apply if there were no evidence to present and that Dr. Montgomery would not provide evidence to support an available defense. Upon review, we conclude that the court did not err in its determination.

We return, then, to the question of whether the Petitioner has established the prejudice prong of an ineffective assistance of counsel claim. Because Dr. Montgomery's testimony would not have been admissible if he had been called a trial witness, the Petitioner failed to show prejudice. The Petitioner is not entitled to relief on this basis.

## II
## Other Failures in the Investigation

In addition to the allegations regarding the failure to pursue mental health evidence to challenge mens rea, the Petitioner contends that his trial attorneys provided ineffective assistance in investigating and preparing for the trial in several respects. He contends they failed to investigate and preserve cell phone records and voice messages, failed to conduct effective interviews of available witnesses, failed to prepare for and conduct effective an cross-examination of Brandon Clark, and failed to develop a defense theory. He argues that these failures, individually or collectively, entitle him to post-conviction relief.

### A.    Failure to Investigate and Preserve Cell Phone Records and Voice Messages

The post-conviction proof showed that the Petitioner provided his cell phone to his mother before his arrest in order for her to provide it to counsel to obtain stored messages for use at the trial. Counsel testified that he hired a person with technical expertise to obtain messages from the Petitioner's cell phone. Co-counsel testified that he was responsible for obtaining the Petitioner's cell phone records, that he had trouble because the provider only maintained records for a short time, and that a subpoena was issued to the cell phone service provider on the Friday before the trial began the following Monday. At the trial, the defense was unable to play the voice messages because the Petitioner's cell phone service had lapsed.

The post-conviction record reflects that counsel knew early in the case that the ongoing conflict between the Petitioner and the victim was important factually. The Petitioner's mother provided counsel with the Petitioner's cell phone, but counsel took no

-22-

immediate action to preserve any available voice messages. The failure to investigate and preserve any available evidence was deficient performance.

Turning to the question of prejudice, we note the Petitioner's trial testimony that he received text and voice messages from the victim and that approximately ninety-eight percent of them were threatening and 100% contained profanity. The Petitioner said that at one point, he filed a complaint with the Macon County Sheriff's Department and had an officer review threatening text and voice messages from the victim. The Petitioner read the content of some of the text messages to the jury and testified about the contents of the voice messages. He said that he had not saved some of the voice messages because of his cell phone's limited capacity. The Petitioner also testified in detail about in-person encounters with the victim. Macon County Sheriff's Deputy Ron Smith testified that in the process of taking a report from the Petitioner against the victim, he reviewed text messages and listened to voice messages, but he did not testify about the contents. The State acknowledged at the trial that the victim was disgruntled with the Petitioner and that the victim sent the text messages and left the voice messages for the Petitioner.

In assessing prejudice, we think it is significant that despite the inability to play the messages for the jury, the Petitioner was able to introduce evidence about their contents. The Petitioner argues that the victim's inflection and anger would have provided probative evidence to support Dr. Montgomery's testimony, had it been presented, of the Petitioner's PTSD. As we have stated, Dr. Montgomery's testimony was inadmissible. We also note the State's acknowledgment at the trial that the victim was angry and hostile toward the Petitioner.

We cannot conclude that the Petitioner was prejudiced by counsel's failure to present the recorded voice messages at the trial. The Petitioner is not entitled to relief on this basis.

**B.** **Failure to Conduct Effective Interviews of Roger Williamson, Maria Creasy, and John Michael McKinnon**

The Petitioner contends that his trial attorneys failed to conduct effective interviews of the Petitioner's parents and his mother's then-boyfriend. He claims that the witnesses would have assisted Dr. Montgomery's evaluation and supported the Petitioner's testimony.

First, the Petitioner argues that his trial attorneys failed to conduct an adequate interview of his father, Roger Williamson. The Petitioner's father did not testify at the trial but did testify at the post-conviction hearing that he was present when the victim chased the Petitioner home after trying to run the Petitioner off the road. The Petitioner asserts that Mr. Williamson could have testified about the large size of the truck the victim drove, the

-23-

victim's "cut[ting] the tailspin" in Mr. Williamson's driveway, and the Petitioner's "shaken" demeanor. Mr. Williamson also testified at the post-conviction hearing that the defense team never questioned him in detail about the Petitioner's background.

Second, the Petitioner argues that his mother, Maria Creasy, was not adequately interviewed. Ms. Creasy did not testify at the trial. The Petitioner asserts that she could have provided relevant information about his childhood, the events before and after the shooting, and his relationship with Ms. Holmes. Regarding the Petitioner's history, he argues that Ms. Creasy could have testified about both his parents' alcoholism and the conflicts between the Petitioner and his father and that these facts contributed to a predisposition to PTSD. He notes Ms. Creasy's testimony at the post-conviction hearing about his starting a new job two days before the shooting and his being unreachable and unable to get out of bed the day before the shooting. He likewise notes her post-conviction testimony about his beer consumption on the day of the crime and his demeanor after the shooting.

Third, the Petitioner argues that John Michael McKinnon was never interviewed about the events on the day of the crime but that he could have testified about the difficulties in the Petitioner and Ms. Holmes's relationship. The Petitioner notes that he was with Mr. McKinnon all day on the date of the crime and that Mr. McKinnon could have testified about their actions, including the amount of beer they drank after finishing work that afternoon.

The record reflects that both trial attorneys met with the Petitioner and that counsel spent a substantial amount of time reviewing the case with the Petitioner. Co-counsel retained investigative assistance early in the case, and Ms. Waltz met with the Petitioner about the facts of the case. Her written report reflects that the Petitioner told her about the incident in which the victim tried to run him off the road and about the conflict between himself and the victim due to the Petitioner's involvement with Ms. Holmes. By his own account, the Petitioner had two or three beers on the night of the crime, and counsel did did not think the Petitioner was intoxicated when the Petitioner turned himself in to the police.

Regarding the adequacy of the investigation, the post-conviction court found that the trial attorneys' testimony was credible regarding their knowledge of the case and preparedness. We acknowledge the court's adverse credibility determinations relative to co-counsel, particularly as regards his attorney's fees, but we note that the court separately credited his testimony regarding his knowledge of the case and trial preparation. We note that counsel's testimony provides some corroboration of co-counsel's preparation efforts. In addition, the court specifically noted and credited counsel's testimony that he knew the facts of the case. The court found that the Petitioner failed to prove by clear and convincing evidence that his attorneys' investigation, preparation, or trial performance was inadequate. The evidence does not preponderate against the court's findings. The Petitioner's attorneys

were aware of the prior conflicts between the Petitioner and the victim and the Petitioner's related state of vigilance and fear. They had Ms. Waltz's report containing information about the incident in which the victim tried to run the Petitioner off the road and followed him home. They investigated the Petitioner's alcohol consumption by asking him how much he drank on the day of the crime, and his answer was consistent with counsel's personal observations of the Petitioner at the sheriff's department after the crime. The court noted that no proof had been offered to show that the Petitioner was intoxicated at the time of the shooting to the extent that it affected his ability to premeditate. The Petitioner has not shown that his trial attorneys' performance was deficient and that he was prejudiced by counsel's performance. He is not entitled to relief on this basis.

## C. Failure to Prepare for and Conduct an Effective Cross-Examination of Brandon Clark

The Petitioner contends that his trial attorneys were ineffective for failing to prepare for and conduct a successful cross-examination of Brandon Clark, who said in a written statement that the Petitioner told him the shooting had been premeditated. The Petitioner testified that after he reviewed the discovery materials, he notified counsel that Mr. Clark's statement was inaccurate about the Petitioner's having said the shooting was premeditated. He contends that counsel should have investigated Mr. Clark's personnel record because it contained information about an investigation of Mr. Clark's off-duty presence at a suspected "drug house" and his apparent intoxication, which he argues could have been used as impeachment evidence. He also argues that counsel's cross-examination of Mr. Clark was ineffective because counsel was not adequately familiar with the Mr. Clark's written statement when counsel attempted unsuccessfully to get Mr. Clark to say that Mr. Clark had not quoted the Petitioner when Mr. Clark used the word "premeditated" in the statement. However, Mr. Clark said he had quoted the Petitioner despite his lack of quotation marks around the word in the statement and his use of quotation marks elsewhere in the statement.

The post-conviction court found that the information in Mr. Clark's personnel file about the off-duty incident was not relevant impeachment evidence. The court noted that the statement had been provided in discovery, that counsel had talked to Mr. Clark a couple of times before the trial, that Mr. Clark had been a reluctant witness, that the prosecutor had been frustrated with the witness, and that the prosecutor had to show the statement to the witness "to draw it out of him." The court found that the Petitioner failed to show ineffective assistance in the preparation for and cross-examination of Mr. Clark. As we noted previously, the post-conviction court credited counsel's testimony that he knew the facts of the case. The Petitioner has not shown on appeal that the evidence preponderates against the post-conviction court's factual findings or that its conclusions are unsupported by the factual findings. The Petitioner is not entitled to relief on this basis.

**D.**     <u>**Failure to Develop a Defense Theory**</u>

The Petitioner contends that his trial attorneys failed to develop a "complete theory of the defense because their theory lacked a recognized challenge to premeditation." He argues that the attorneys' lack of further investigation about the Petitioner's alcohol consumption and lack of a timely psychiatric evaluation show their failure to develop a defense theory to show why the Petitioner could not form the mens rea for first degree murder. As we have stated, the post-conviction court expressed concern about co-counsel's billing practices, but it credited counsel's testimony about his and co-counsel's investigation and preparation of the defense. The record shows that the Petitioner's trial attorneys consulted with him about the facts and the trial. To the extent that the Petitioner may have provided them with erroneous or misleading information about his alcohol consumption, the reasonableness of the Petitioner's attorneys' actions must be evaluated in this light. *See Strickland*, 466 U.S. at 691. Although the attorneys failed to consult with a psychiatric expert promptly, the Petitioner failed to demonstrate by clear and convincing proof that prompt consultation would have resulted in the development of admissible evidence to support a defense theory that the Petitioner was unable to form the culpable mental state. Prompt consultation would not have affected the defense strategy because Dr. Montgomery's testimony was inadmissible. The Petitioner is not entitled to relief on this basis.

The judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE