IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 18, 2018

**MARTIN DEAN "CUB" MEEKS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Grundy County**
**Nos. 31CC1-2009-CR-2774, 4560       Thomas W. Graham, Judge**

_____

**No. M2017-01887-CCA-R3-PC**

_____


The Petitioner, Martin Dean "Cub" Meeks, appeals the post-conviction court's denial of his petition seeking to overturn his conviction for first degree premeditated murder. The Petitioner alleged that trial counsel was deficient in failing to obtain expert evidence, but he did not present any expert testimony at the post-conviction hearing. Because the Petitioner has not shown that he received ineffective assistance of counsel, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Alice W. Wyatt, Dunlap, Tennessee, for the appellant, Martin Dean "Cub" Meeks.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Mike Taylor, District Attorney General; and Steve Strain and David O. McGovern, Assistant District Attorneys General, for the appellee, State of Tennessee.


**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

**Trial**

During the course of a confrontation, the Petitioner shot and killed the victim, who lived in a mobile home on property owned by the Petitioner's family. The Petitioner, who knew the victim to be habitually armed, maintained that he shot in self-defense when

he saw the victim digging in his pocket as though reaching for a revolver. A black-handled revolver was discovered under the hip of the deceased victim, who had fallen on his side. The defense argued at trial that the reasonable inference was that the victim was attempting to shoot the Petitioner, whereas the State argued that a cigarette and cigarette lighter found near the victim's hands precluded the idea that he was also holding a gun.

The proof at trial showed that the Petitioner's parents had invited the victim to move his trailer onto their property twenty-five to thirty years prior to the shooting and that the victim had continued to live there in the interval without paying rent. The Petitioner's father was deceased, but his mother resided in a home on the property. Both the Petitioner and his mother had a friendly relationship with the victim.

A number of months prior to the shooting, the Petitioner moved in with his aging mother to help care for her. The area near the victim's mobile home had become overgrown and neglected, and it contained several dilapidated outbuildings. The Petitioner, with his mother's permission, told Ms. Renee Brown Stephens and Mr. Glen Stephens that they could move their horses and a mobile home onto the property if they would help clear out the land.

The victim proved reluctant to share the property, and during the month that the Petitioner and his friends worked at clearing the property, the victim continually cursed at and harassed them. A few days prior to the shooting, the victim told one of his relatives that the Petitioner's friends would be working on the property that weekend and that he was "going to shoot in the middle of them." The Petitioner likewise testified that the victim had threatened to kill him.

On the day of the shooting, the Petitioner, Ms. Stephens, Mr. Stephens, Mr. Kenneth Clay, Mr. Brian Meeks, and Mr. Stephens's teenage son were working to clear out the land and were burning a building which was in danger of collapse. All but Mr. Meeks testified at trial. The witnesses testified that the victim arrived at the property irate that the fire was near his home and began to curse the workers. The Petitioner told police in his statement that the victim threatened to kill him. After a period of argument, the Petitioner walked to his mother's home approximately 100 to 150 yards away to retrieve a shotgun and five shells. According to the Petitioner's testimony, he checked the gun outside his mother's home, discovered it was already loaded, and put the extra shells into his pocket. He walked back to the area of the victim's mobile home. The Petitioner acknowledged to police that he was very angry at this time and that sometimes he gets so angry that he "blacks out."

When the Petitioner returned, the argument escalated. In his statement to police, the Petitioner stated that he was angry and that he told the victim to "get [his] damn

trailer and leave." *State v. Martin Dean "Cub" Meeks*, No. M2012-02200-CCA-R3-CD, 2013 WL 3968195, at *4 (Tenn. Crim. App. Aug. 1, 2013), *no perm. app. filed.* When asked what he planned to do when he returned with his gun, the Petitioner told police, "If he tried to shoot me, I'd sh[o]ot him." *Id.* at *5. Mr. Stephens and his son testified that they could see the victim and the Petitioner during the second phase of the argument and that the Petitioner did not have the gun pointed at the victim. Mr. Stephens, his son, and Ms. Stephens testified that they heard the Petitioner say something similar to, "Please, don't," to the victim immediately prior to the shooting. Ms. Stephens, however, acknowledged that in a prior statement, she had told law enforcement she was the one who spoke the phrase to the Petitioner. Mr. Stephens recalled seeing the victim digging in his pocket immediately prior to the shooting and saw a black object in the victim's hand. When misinformed by the police that no gun was found, Mr. Stephens acknowledged to police that the object in the victim's hand could have been a cigarette case.

The Petitioner shot the victim in the chest with a slug, and the victim died shortly thereafter from blood loss. The Petitioner placed the gun and extra shells on a nearby "smoker," and he asked his guests to leave. Ms. Stephens remained with the Petitioner and assisted him in calling for help because he was too upset to be able to communicate with the 911 operator. He maintained throughout the investigation that he only shot because he believed the victim was preparing to shoot him.

A black revolver was found under the victim's hip, and a red lighter and a cigarette, which had burned down to the filter, were near the victim's hands. A shell casing was discovered around the corner of an outbuilding. A firearms expert testified that he tested the Petitioner's shotgun, that it automatically ejected casings six to eight feet after firing, and that a casing could subsequently roll on the ground. Sheriff Brent Myers testified that he believed from the location of the casing that the Petitioner was at the corner of the outbuilding and could have been standing beside a tree at the corner. Agent Larry Davis likewise testified that based on the location of the casing, he believed the Petitioner was either at the corner of the building or just past the tree, but he also testified that he believed the shotgun ejected casings only four to six feet. The Petitioner testified that he walked approximately four to five feet from the corner of the building and was facing the victim in the open prior to firing the shot. Approximately five hours after the shooting, the Petitioner's blood alcohol level was determined to be 0.07 percent, and his blood also showed the presence of diazepam, commonly known as Valium, and a metabolite of diazepam.

During deliberations, the jury sent out a written question asking about the presence of "punts," which the parties speculated was a misspelling of "prints," on the victim's gun, and they also submitted a written question asking if the Petitioner had a prescription

- 3 -

for Valium. The trial court informed the jury that no further proof would be presented in the case. The jury convicted the Petitioner of first degree premeditated murder, and he received a life sentence. On appeal, the Petitioner argued that the trial court failed to act as thirteenth juror, that the evidence was insufficient to support premeditation, and that it was error to refuse to instruct on voluntary intoxication. *Id.* at *1. This court affirmed the conviction and sentence. *Id.*

## Post-Conviction

The Petitioner filed a timely post-conviction petition which was subsequently amended by post-conviction counsel. Among the issues raised were trial counsel's failure to obtain a mental health evaluation for the Petitioner and trial counsel's failure to obtain a crime scene reconstruction expert.

Trial counsel testified that at the time of trial, he was the District Public Defender, a post he had held since 1989. Trial counsel had handled numerous homicide cases in his career. He and another attorney from the Public Defender's Office represented the Petitioner at trial, and he met with the Petitioner frequently. The defense theory was that the homicide had either been committed in self-defense or that the presence of adequate provocation reduced the crime to voluntary manslaughter.

Trial counsel was aware that he could apply for funding for expert witnesses on behalf of an indigent client. He testified that he generally evaluated a client's ability to communicate and comprehend in deciding whether to engage a mental health expert but that he would not necessarily engage one based on physical disability or the client's use of pain medication. He likewise stated that he would evaluate a client's ability to communicate in deciding whether low intelligence, a learning disability, or the client's use of psychiatric medication would warrant obtaining a mental health expert. Trial counsel testified that his conversations with the Petitioner never caused him to have any concern that the Petitioner had a mental health issue. The Petitioner was able to communicate with trial counsel and understand the issues at trial, and he was "forthcoming" with information.

Trial counsel stated he was not aware that the Petitioner received disability income, and he did not recall seeing the Petitioner's affidavit of indigency, which reflected that he received disability income. Trial counsel noted that many of his clients received income from disability but did not suffer from mental illness. He acknowledged that he would have been concerned if he had seen a note indicating that the Petitioner had attempted to commit suicide. Post-conviction counsel introduced notes from the Public Defender's file which documented that the Petitioner read slowly and may have been dyslexic, that the Petitioner had attempted suicide, and that the Petitioner was taking

"psych meds" and "pain shots." Trial counsel could not identify the notes and speculated that they may have been written by the assistant public defender who represented the Petitioner at the preliminary hearing. Trial counsel testified that the assistant public defender who handled the preliminary hearing was particularly concerned with the mental health of his clients and would have noticed if the Petitioner had been suffering from mental illness.

Trial counsel identified his own notes documenting a meeting with the Petitioner. The notes recount that the Petitioner asked about a plea offer for six years of incarceration which he believed that trial counsel had conveyed to him by telephone. It is apparent from the notes that while trial counsel did not recall communicating with the Petitioner about such an offer, he did not entirely discount the possibility that such communication had occurred. The notes reflect that trial counsel attempted to contact the prosecutor from the jail in order to establish whether an offer had been made, and the notes conclude, "hopefully there is a memo in my files to document that I at least had that conversation with [the prosecutor]." The notes also reflect that the Petitioner may have believed there was a plea offer due to a conversation that the Petitioner had with the sheriff. Trial counsel testified at the post-conviction hearing that the Petitioner's reference to a nonexistent plea offer did not cause him concern for the Petitioner's mental health because inmates would sometimes get misinformation from other inmates or from persons in positions of authority regarding the possibility of a plea offer.

Post-conviction counsel also introduced handwritten notes which documented that the Petitioner had told trial counsel that even a six-year sentence would essentially amount to a life sentence because the Petitioner believed he had a brain tumor. Trial counsel testified that the Petitioner's ability to communicate with trial counsel and comprehend information did not appear negatively affected by any tumor. Trial counsel acknowledged that his office sent the Petitioner a letter which the Petitioner claimed never to have received.

Post-conviction counsel introduced the Petitioner's medical records, which reflected that he had attempted to commit suicide on May 18, 2008; that he had been hospitalized for dizziness on November 3, 2008; that he was hospitalized for fainting on December 25, 2008; and that he was again hospitalized for fainting on July 12, 2010. The Petitioner's medical records indicated that he did not remember in 2010 that he had previously had a fainting episode, and a CT scan revealed an arachnoid cyst, which medical records described as "probably old," in his brain.

Trial counsel interviewed the Petitioner's mother but did not ask her about the Petitioner's mental health. He identified a document directing the Petitioner's mother to permit preliminary hearing counsel to review the Petitioner's records, and trial counsel

agreed that during his representation of the Petitioner, he would have had access to the document granting access to the records. Trial counsel did not recall the jury's sending a question during deliberations regarding the Petitioner's prescription for Valium.

Trial counsel interviewed law enforcement officers and all of the witnesses who had been on the property at the time of the shooting. He testified that he investigated and photographed the scene of the crime. He agreed that the crime scene had changed considerably by the time he visited it, noting that a trailer had burned down. He relied on the photographs and sketches submitted by the State, and the State's photographs were taken within two hours of the shooting. He agreed that a crime scene sketch produced at the scene did not include the victim's gun and that it was not to scale. Post-conviction counsel noted that although the sheriff claimed to have produced the sketch, a Tennessee Bureau of Investigation report reflected that it was produced by an investigator. Post-conviction counsel also introduced subsequent handmade sketches produced by the sheriff during witness interviews.

Trial counsel did not consider attempting to obtain a crime scene expert. He noted that none of the State's witnesses were qualified as crime scene experts and that he had never seen a crime scene expert used in the district. He agreed that pictures presented at the post-conviction hearing showed that the victim's body had been moved. Emergency services records showed that a call was made at 17:48 on the day of the crime, that medical personnel arrived at 18:05, and that police arrived at 18:11. Trial counsel did not recall inquiring into whether the victim had any cigarettes on his person or why he would be looking for a lighter for a lit cigarette. Trial counsel interviewed patrons of a service station that the victim frequented, and they told him that "about everybody around here carries a weapon" but did not specifically state that the victim carried one. Trial counsel presented the testimony of a relative of the victim, who stated that the victim had threatened to shoot the Petitioner and his guests. He did not call a police officer who encountered the victim the morning of the shooting and was told by the victim that "the Sheriff's Department had better do something [about the Petitioner's horses] or he would." Trial counsel testified that the "bugaboo question" with respect to the crime scene was whether the victim's gun had been drawn from his pocket when he was shot. No one had been able to determine whether the gun fell out of the victim's pocket or was dropped from his hand.

The post-conviction court found that trial counsel had no difficulty communicating with the Petitioner and had no reason to doubt the Petitioner's competency at the time of the crime. Accordingly, it found that the failure to evaluate the Petitioner's mental health was not deficient. Likewise, the post-conviction court found that once the crime scene had been altered, there was no way to accurately reproduce it and that lack of better crime scene evidence could not be attributed to any deficiency on the part of trial counsel.

- 6 -

Addressing prejudice, the post-conviction court found that the proof at the hearing was speculative and that the Petitioner had not demonstrated prejudice. The Petitioner appeals the denial of the petition.

## ANALYSIS

The Petitioner asserts that he is entitled to post-conviction relief. The Post-Conviction Procedure Act provides for relief when a petitioner's conviction or sentence is void or voidable due to the abridgment of a right guaranteed by the United States Constitution or by the Tennessee Constitution. T.C.A. § 40-30-103. The Petitioner here claims that his sentence is voidable because he received ineffective assistance from his trial counsel, and a claim of ineffective assistance of counsel is a mixed question of law and fact. *Moore v. State*, 485 S.W.3d 411, 419 (Tenn. 2016). An appellate court reviews de novo with no presumption of correctness the post-conviction court's conclusions of law, its determinations of mixed questions of law and fact, and its application of law to factual findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). The post-conviction court's factual findings are conclusive on appeal unless the record preponderates otherwise. *Nesbit v. State*, 452 S.W.3d 779, 786 (Tenn. 2014). An appellate court does not reweigh or reevaluate the evidence or substitute its own inferences for those of the fact-finder. *Kendrick*, 454 S.W.3d at 457. On appeal, we defer to the post-conviction court's findings regarding witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence. *Id.* The petitioner bears the burden of demonstrating the allegations of fact entitling him to relief by clear and convincing evidence. T.C.A. § 40-30-110(f).

A person accused of a crime is entitled to the assistance of counsel in criminal proceedings under the Sixth Amendment to the United States Constitution and under article I, section 9 of the Tennessee Constitution. These provisions guarantee the reasonably effective assistance of counsel. *Nesbit*, 452 S.W.3d at 786. The deprivation of this right is a cognizable claim under the Post-Conviction Procedure Act. *Moore*, 485 S.W.3d at 418. To prevail on a claim, the petitioner must show that trial counsel's representation "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).

In order to demonstrate that he received ineffective assistance of counsel, a petitioner must show both that trial counsel performed deficiently and that the deficient performance prejudiced the defense. *Nesbit*, 452 S.W.3d at 786 (citing *Strickland*, 466 U.S. at 687). Failure to prove either deficiency or prejudice precludes relief, and the court need not address both components if the petitioner has failed to make a showing on one. *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011).

- 7 -

To show deficient performance, a petitioner must demonstrate that "'counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing at the time of trial." *Felts*, 354 S.W.3d at 276 (Tenn. 2011) (quoting *Strickland,* 466 U.S. at 688). In other words, the petitioner must demonstrate that counsel's errors were "'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland,* 466 U.S. at 687). Counsel's performance is not measured by "'20-20 hindsight.'" *Id.* at 277 (quoting *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). Instead, the court applies a strong presumption that counsel's performance was within the bounds of reasonable professional assistance. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Strickland,* 466 U.S. at 690-91).

To show prejudice, a petitioner must establish that there is "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Felts*, 354 S.W.3d at 277 (quoting *Strickland,* 466 U.S. at 694). The question at its core is "'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" *Kendrick*, 454 S.W.3d at 458 (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 372, (1993)).

When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "'As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting *Black*, 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black*, 794 S.W.2d at 757. Presenting the witness allows the post-conviction court to determine whether that witness's testimony would have been credible, material, and admissible. *Pylant*, 263 S.W.3d at 869-70.

## A. Failure to Obtain Mental Health Evaluation

The Petitioner argues that trial counsel was deficient in not seeking to have the Petitioner's mental health evaluated prior to trial. The Petitioner notes that trial counsel was on notice that the Petitioner was disabled; that the Petitioner believed he had a brain

tumor; that he had attempted suicide; that he was possibly dyslexic; that he was taking psychiatric medication; that he would sometimes forget events that occurred when he was very angry; that he claimed to have had a conversation with trial counsel which trial counsel believed never took place; that he claimed not to have received one of trial counsel's letters; and that the toxicology report indicated he was taking diazepam at the time of the crime.

The Petitioner notes that despite these indications of a possible mental health issue, trial counsel did not interview the Petitioner or his family about his medical and mental health history and did not obtain the Petitioner's medical records, which indicated a prior suicide attempt, fainting, and an arachnoid cyst in his brain. The post-conviction court credited trial counsel's testimony that the Petitioner had no difficulty communicating with him or understanding the proceedings and that he accordingly did not believe that a mental health evaluation was necessary. At trial, the defense attempted to show that the Petitioner had acted in self-defense by shooting the armed victim, who had threatened to kill the Petitioner. The defense also asserted that the act of retrieving the shotgun was not indicative of premeditation because the Petitioner did not intend to harm the victim but only wanted to be able to protect himself should the victim follow through with his threats. To that end, the defense presented numerous witnesses, including the Petitioner, who testified regarding the victim's hostile behavior and the Petitioner's reasonable belief that the victim was attempting to retrieve a weapon from his pocket. The Petitioner testified lucidly at trial.

At the post-conviction hearing, the Petitioner established that he had attempted suicide, suffered episodes of fainting, had an arachnoid cyst in his brain, and was taking diazepam, but there was no testimony from a mental health expert regarding what effect, if any, these mental health issues would have had on the Petitioner's competency to stand trial or ability to act in a premeditated fashion. The Petitioner has not shown that the omitted mental health evaluation affected the results of the proceeding. *See Williamson v. State*, 476 S.W.3d 405, 422-23 (Tenn. Crim. App. 2015) (concluding that although trial counsel was deficient in failing to obtain a mental health evaluation of the petitioner, the expert's testimony would not have been admissible unless it reached the "ultimate issue of the Petitioner's capacity to form the required mens rea"). Accordingly, the Petitioner has not shown prejudice.

The Petitioner notes that there is no public funding available to obtain a mental health expert for post-conviction relief. *See* Tenn. Sup. Ct. R. 13, § 5(a)(2); *Davis v. State*, 912 S.W.2d 689, 696-97 (Tenn. 1995) ("[T]he state is not required to provide expert assistance to indigent non-capital post-conviction petitioners."). He argues that trial counsel's failure to avail himself of funding is accordingly prejudicial because it permanently deprived the Petitioner of the opportunity to obtain any evidence regarding

mental illness or defect which could have rebutted premeditation or otherwise assisted the defense. This argument in essence asks us to impose a new standard for prejudice, one that analyzes whether any alleged deficiency has resulted in the loss of the opportunity to obtain or generate evidence. We decline to do so. Instead, our prejudice inquiry focuses on whether there is a reasonable probability that the outcome of the trial would have been different were it not for any deficiency on the part of trial counsel. Here, there is no evidence to suggest that a mental health evaluation would have shown that the Petitioner was not competent to stand trial, that he was incapable of performing a premeditated act, or that the discovery of a mental health issue would otherwise have affected the result of the proceeding. *See Pylant*, 263 S.W.3d at 869; *Black*, 794 S.W.2d at 757; *see also Joseph Cordell Brewer, III, v. State*, No. W2016-02106-CCA-R3-PC, 2018 WL 446686, at *4 (Tenn. Crim. App. Jan. 16, 2018), *perm. app. denied* (Tenn. May 17, 2018) (concluding that the petitioner could not show prejudice without presenting an expert and noting that the petitioner did not raise the argument that his inability to present expert testimony violated his due process rights). The Petitioner has not demonstrated that the absence of an evaluation by a mental health expert had any effect on the outcome of the proceeding, and he is not entitled to relief.

### B. Failure to Obtain a Crime Scene Expert

The Petitioner also faults trial counsel for failing to procure an expert to dispute the crime scene evidence. He asserts that the testimony of Sheriff Myers and Agent Davis tended to suggest that the Petitioner had ambushed the victim, that the evidence demonstrated that the victim's body had been moved by law enforcement and possibly medical personnel, and that the crime scene drawings submitted by the State were inaccurate. The State responds that the decision to rely on crime scene evidence gathered by the State was reasonable and that the Petitioner has not established prejudice. The post-conviction court found that lack of better crime scene evidence could not be attributed to any deficiency on the part of trial counsel and that the Petitioner had not shown prejudice.

At the post-conviction hearing, trial counsel testified that the "bugaboo question" at trial was whether the victim was in the process of drawing his weapon when the Petitioner fired. Trial counsel stated that he was not aware of any expert testimony that could have assisted the defense on that issue. The proof at trial was that, after retrieving the shotgun, the Petitioner came around the corner of an outbuilding, continued the argument with the victim, and ultimately fired at the victim. While a police report reflects that police initially suspected the Petitioner of "ambush[ing]" the victim, the State's witnesses at trial testified only that the Petitioner was near the corner of a building, and none of the State's witnesses testified as experts in crime scene reconstruction. Instead, the jury was essentially tasked with determining whether the

Petitioner had acted in self-defense and, if not, whether the Petitioner's act of retrieving the shotgun and then shooting the victim was premeditated. Trial counsel extensively cross-examined the witnesses about inaccuracies in the crime scene drawings and about the placement of the victim.

The Petitioner makes no allegations regarding what testimony an expert could have given to support the defense theory that the victim was in the process of drawing his gun or how an expert would have otherwise supported the Petitioner's version of events. Trial counsel thoroughly cross-examined the State's witnesses regarding the crime scene, and he introduced witnesses who supported the Petitioner's testimony that he confronted the victim and that the victim appeared to be drawing a weapon. We cannot conclude that trial counsel was deficient in failing to obtain a hypothetical crime scene expert.

Neither did the Petitioner present the testimony of any crime scene expert at the post-conviction hearing to demonstrate that expert testimony would have shown that the crime scene supported the defense's theory of the events. Without such an expert, the Petitioner cannot show that there is a reasonable probability that trial counsel's failure to obtain expert evidence affected the outcome of the trial. *See Pylant*, 263 S.W.3d at 869; *Black*, 794 S.W.2d at 757. We conclude that the Petitioner has not demonstrated any prejudice.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 11 -